1
2
3
4
5
6
7
8

9               **UNITED STATES DISTRICT COURT**

10             **SOUTHERN DISTRICT OF CALIFORNIA**

11

12  TODD NASH, an individual,                      CASE NO. 08cv893-WQH-RBB

13                              Plaintiff,         ORDER
               vs.
14  LIFE INSURANCE COMPANY OF
    NORTH AMERICA, an Illinois
15  corporation, GROUP LONG TERM
    DISABILITY INSURANCE PLAN FOR
16  ADMINISTAFF OF TEXAS INC. AND
    PARTICIPATING COMPANIES, a
17  group welfare benefits plan under ERISA,

18                              Defendants.

19  HAYES, Judge:

20       The matter before the Court is the Findings of Fact and Conclusions of Law pursuant

21  to Rule 52(a) of the Federal Rules of Civil Procedure.

22                              **Background**

23       This is an action for disability benefits under the Employee Retirement Income Security

24  Act of 1974 ("ERISA").  Plaintiff Todd Nash submitted a claim for disability under a group

25  insurance policy.  Plaintiff received benefits for two years and one month.  Plaintiff's benefits

26  were subsequently terminated and Plaintiff appealed.  This lawsuit followed.

27       On September 24, 2010, the Court conducted a bench trial.  (ECF No. 97).  Prior to trial,

28  all exhibits had been filed with the Court.

**Findings of Fact and Conclusions of Law**

**I.      Governing Policy and Plan**

Defendant Life Insurance of North America ("LINA" or "Defendant") issued a group insurance contract, Group Policy SLK-030024 ("Policy"), to Administaff of Texas ("Administaff") effective January 1, 2000, to provide short term disability ("STD") and long term disability ("LTD") coverage to all full time active employees of Administaff and its participating companies, including Morpho Technologies ("Morpho").

The Policy has two disability definitions related to a Disability Claim by a Class I insured, the first applicable to the first 30 months comprising the STD and the "regular occupation" disability period, and the second applicable to disabilities that continue beyond 30 months, known as the "any occupation" disability period.  (Pretrial Order ("PTO") Ex. C at 27, ECF No. 77-1).  The Policy states:

> **Definition of Disabled/Disability**
>
> The Employee is considered Disabled if, solely because of Injury or Sickness, he ... is either:
>
> 1.      unable to perform all the material duties of his ... Regular Occupation or a Qualified Alternative; or
>
> 2.      unable to earn 80% or more of his ... Indexed Covered Earnings.
>
> After Disability has lasted 30 months, the Employee is considered Disabled if solely due to Injury or Sickness, he ... is either:
>
> 1.      unable to perform all the material duties of any occupation for which he ... is, or may reasonably become, qualified based on education, training or experience; or
>
> 2.      unable to earn 80% or more of his ... Indexed Covered Earnings.
>
> The Insurance Company will require proof of earnings and continued Disability.

*Id*.  The Policy provides that "[b]enefits will end" on "the date the Insurance Company determines [the Employee] is not Disabled."  *Id*. at 43.  The Policy provides that "[t]he Insurance Company, at its expense, will have the right to examine any person for whom a claim is pending as often as it may reasonably require."  *Id*. at 45.  Pursuant to the Policy, LINA is responsible for investigating the claim, making the decision whether to pay benefits, and payment of the benefits.

The Policy defines "Regular Occupation" as: "The occupation the Employee routinely performs at the time the Disability begins.  In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy." *Id*. at 50.  The Policy defines "Qualified Alternative" as an occupation that meets all of the following conditions:

1.   the material duties of the occupation can be performed by the Employee based on his ... training, experience or education;

2.   it is within the same geographic area as the Regular Occupation the Employee holds with the Employer on the date the Employee's Disability begins;

3.   a job in that occupation is offered to the Employee by the Employer; and

4.   the wages for that occupation, including commissions and bonus, are 80% or more of the Employee's Indexed Covered Earnings.

*Id*.

The Policy provides that after six months of STD benefits, monthly LTD benefits will be paid for continuing disability at the rate of "the lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearest dollar or the Maximum Monthly Benefit" of $10,000 per month.  *Id*. at 28.

The Summary Plan Description states:

The Insurer is the Claims Administrator for the Plan.  The Claims Administrator administers all claims and appeals on behalf of the Plan.  For this purpose, the Claims Administrator is a named fiduciary of the Plan under ERISA.  As Claims Administrator, the Insurer has the authority, in its discretion, to interpret the terms of the Plan, decide questions of eligibility for coverage or benefits under the Plan and make any related findings of fact.  All decisions made by the Claims Administrator are final and binding on all persons covered under the Plan to the full extent of the law.

(PTO Ex. A at 9, ECF No. 96).

## II.   Facts

Plaintiff, born in 1963, received a Bachelors Degree in Electrical Engineering in 1986.  From 1988 to 2003, Plaintiff's occupation was in sales and marketing.  In 2002, Plaintiff received an MBA and MSBA in Finance/Tax.

From April 9, 2001 to September 26, 2003, Plaintiff was Vice President of Business Development at Morpho.  Plaintiff's duties encompassed all of the company's sales and

marketing tasks, both foreign and domestic, and required domestic and international travel and associated business meetings, in addition to corporate management activities.  Vice President of Business Development is a sedentary occupation requiring primarily sitting all day.

Plaintiff was co-employed by Morpho and Administaff and covered under Administaff's benefits plans including the disability Plan at issue in this case.  Plaintiff was a "key employee" of Morpho and a Class I covered participant (applicable to "officials and managers") in the Plan.  (PTO Ex. D at 912, ECF No. 69).  Plaintiff's annual earnings before becoming disabled were $151,424.00, an average of $12,618.66 Covered Earnings.

In February of 1998, Plaintiff sought medical treatment for left hip pain.  On February 3, 1998, X-rays of Plaintiff's pelvis and left femur "show[ed] mild degenerative change, with some subchondral sclerosis and osteophyte formation and slight joint space narrowing superiorly and laterally."  (PTO Ex. C at 2257, ECF No. 83).

On April 27, 1998, orthopedic surgeon Leonard R. Ozerkis, M.D. examined Plaintiff and the February 3, 1998 X-rays.  Plaintiff reported that he had been experiencing left hip pain and stiffness and difficulty tying his shoe laces.  Dr. Ozerkis recorded Plaintiff's left hip range of motion ("ROM") as follows:  "Hip flexion is to about 75°, extension is full.  There is external rotation on the left side to 15-20°, internal rotation 0°.  Abduction and adduction was mildly painful and somewhat limited."[1] *Id*. at 2245.  Dr. Ozerkis' assessment was "early degenerative arthrosis left hip." *Id*.  Dr. Ozerkis advised Plaintiff to lose weight, exercise and "explained to [Plaintiff] that he will probably need a joint replacement at sometime in the next 5-10 years but he should try to put it off as long as possible." *Id*.

On July 18, 2003, Plaintiff's then-family practitioner, Dr. Mahyar Ajir, D.O., referred Plaintiff to orthopedic surgeon Behrooz Tohidi, M.D. for "problem[s] with ROM" of the hip and ordered bilateral hip X-rays. *Id*. at 2261.

On July 18, 2003, X-rays of Plaintiff's hips were taken and compared to the February 3, 1998 X-rays. Jeffrey S. Miller, M.D. reported: "Again seen is apparent old left femoral neck

---

[1]  The normal ROM limits for the hip joint are: Flexion – 120°; Extension – 30°; Abduction – 45°; Adduction – 30°; External Rotation – 45°; Internal Rotation – 45°. (PTO Ex. D at 387, ECF No. 61).

fracture deformity with some remodeling.  Again seen is osteophytosis and superior joint space narrowing, which may be slightly increased compared with prior study." *Id.* at 2885.  Dr. Miller's impression was "post traumatic change of the left femoral neck, apparently due to old fracture with moderate to severe left sided osteoarthritis slightly progressed compared with prior study." *Id.*

On August 8, 2003, Dr. Tohidi examined Plaintiff and reported that "[t]here is marked limitation of motion to the left hip with 0 degrees of external rotation, about 30 degrees of internal rotation, 25 [degrees] of abduction, 15 degrees of adduction...." *Id.* at 2286.  Plaintiff complained of "pain deep inside the left hip, which is constantly present....  Long sitting is painful, which he particularly notices when he is traveling overseas, which he does about once a month." *Id.* at 2285.  Dr. Tohidi reported that Plaintiff is allergic to aspirin.  With respect to the July 2003 X-ray films, Dr. Tohidi stated: "The x-rays elicit severe posttraumatic degenerative arthritis of the left hip with congruent loss of the articular space and bone-on-bone contact in the weight-bearing dome and in zone 3 of the acetabulum.  The patient otherwise elicits with type-B bone in the proximal femur." *Id.* at 2286.  Dr. Tohidi diagnosed Plaintiff with "[s]evere posttraumatic degenerative arthritis of the left hip." *Id.*  Dr. Tohidi ordered standing X-rays of the left hip and stated: "In my opinion the treatment options include intermittent injections ... versus a total hip replacement.  A hip fusion in this patient will be very debilitating as the present problem is inadequate flexion of the hip and problems with sitting." *Id.*

On August 14, 2003, Dr. Tohidi injected Xylocaine and Depo-Medrol in Plaintiff's left hip for "diagnostic and therapeutic" purposes. *Id.* at 2284.  Dr. Tohidi reported the results of standing X-rays of Plaintiff's left hip taken on August 8, 2003: "severe degenerative arthritis with complete loss of the articular space and bone-on-bone contact." *Id.*

On September 5, 2003, Dr. Tohidi again saw Plaintiff.  Dr. Tohidi stated:

> The injection was only helpful for a short-time basis, and the pain has been recurrent in the same way.  [Plaintiff] describes severe pain when sitting in a confined area such as a chair or an airplane seat for any length of time, ranging from as little as 45 minutes to 90 minutes.  Sitting after 90 minutes increases his pain and increases the length of time that he takes to recover.

His work as vice president in business development in his company requires attending many meetings at both customer locations and within the company's own offices.  Meetings can last for several hours with limited breaks and very limited opportunity to move about or reposition himself to avoid pain.  Of course, when aboard an airplane he sits anywhere from 90 minutes to in excess of 12 hours.  He also, especially when traveling, has to board public transportation such as buses or passenger vans or trains and has to sit for anywhere from 30 minutes to in excess of three hours without being allowed to move around adequately.  Driving a vehicle for anything over 30 minutes produces increased hip pain.

He states that his job has recently demanded that he travel much more frequently and for much longer distances such as international travel than he previously had to do, and he is finding it increasingly difficult because of his hip pain.

He is not able to take anti-inflammatory drugs, and he has not been able to reduce his hip pain with acetaminophen.  If he takes narcotics for pain control, he is not in a cognitive state that allows him to perform his job or operate a vehicle in order to get to and from work or, especially while in a foreign country to operate a motor vehicle or seek other transportation while performing his work duties.

The treatment options were discussed with him.  At this time it is obvious that the Injection did not provide any long-term improvement and therefore, symptomatic treatment and activity modification versus a hip replacement would be the options of treatment.  Presently he does not wish to proceed with a total joint considering his age.  He will eventually need such a procedure, but I would recommend that he wait until his symptoms are more severe and more disabling.

*Id.* at 2283.

On September 10, 2003, Plaintiff filled a prescription for 40 tablets of Hydrocodone, the generic equivalent of Vicodin.  Dr. Tohidi stated that Vicodin "affects [Plaintiff's] cognitive status."  *Id.* at 2732.  Plaintiff stated that he "[o]nly takes [Vicodin] if [he] can't manage [pain] by changing activity, i.e. laying down," because when he takes Vicodin, he "can't drive or do anything that takes thinking."  *Id.* at 1368.

After seeing Plaintiff on September 26, 2003, Dr. Tohidi stated:

[Plaintiff's] pain is essentially intolerable when he is confined to sitting for a prolong period, i.e., when he travels or when he is in meetings where he has to sit confined to a space for some time.  He has reached the point where he is unable to withstand the extent of the pain and remain functional at his present job description.

The treatment of the hip condition, i.e., the osteoarthritis, will be a total hip replacement, but since he is capable of carrying out his daily living activities, therefore, I recommend that his job be modified to eliminate frequent travel and also frequent meetings so that he can remain functional.  If that will not be a possible for him, then I would recommend he be considered disabled.

I would like him to follow up periodically and, obviously, if his hip pain

continues to progress, at some point in the future he will be a candidate for total hip replacement.

*Id*. at 2282.

On September 26, 2003, Dr. Tohidi completed and submitted LINA's Disability Questionnaire form listing a diagnosis of "severe osteoarthritis left hip," and stated Plaintiff was continuously disabled "from 9-26-03 thru to be determined."  *Id*. at 2886.  In the September 26, 2003 form, Plaintiff stated that his occupation was in "Sales & Marketing – extensive travel, extensive sitting in confined spaces" and he had "severe pain in left hip."  *Id*.

On October 1, 2003, Dr. Tohidi completed a LINA medical form, referring to his "dictation of 9-5-03" and providing the following responses:

> [P]rimary diagnosis ... severe degenerative osteoarthritis left hip....

> [C]urrent medications ... Vicodin - prescribed because he cannot take anti-inflammatory drugs.  Acetaminophen does not help.

> [S]pecific restrictions  ... no sitting in a confined space over 30-45 minutes without the ability to get up & move around some.

> Could your patient return to work at this time if accommodations were made for the listed restrictions?  Yes ... provided pain is controlled - Vicodin affects cognitive status.

> [W]hat is your best estimate of when your patient can return to work with restrictions?  Unknown ... to be determined by ability to manage pain.

*Id*. at 2732.

On October 7, 2003, Plaintiff told LINA that he was "[u]nable to sit for long periods of time"; that he "can sit 30-45 min w/o feeling a lot of pain, then it gets worse"; his condition impacts his activities of daily living "because he can not work and take [narcotic] pain medications"; and "Cortisone injections [had] failed."  *Id*. at 1349.

On October 11, 2003, LINA's Nurse Case Manager Sharon Reeves contacted Dr. Tohidi, summarized his diagnosis and findings, and stated that "Continued [treatment] Appropriate" and "[Plaintiff] is medically supported."  *Id*. at 1344.

On October 14, 2003, LINA approved Plaintiff's claim for STD benefits.

On October 15, 2003, LINA documented that it had "received word from the HR Specialist that the client company can not accommodate [LINA's] request for an early return

with restrictions [of no sitting in confined places for longer than 30-45 minutes without the ability to get up and move around]." *Id.* at 2030.

On November 21, 2003, Dr. Tohidi completed and submitted LINA's Physical Abilities Assessment Form.  Dr. Tohidi stated that Plaintiff's upright sitting, standing and walking were each limited to less than 2.5 hours per eight-hour workday.  Dr. Tohidi stated that Plaintiff could tolerate a "sedentary" "physical work level (lift, carry, push, pull)." *Id.* at 2734.  Dr. Tohidi wrote:

> [Plaintiff] has severe L hip pain when sitting in a confined area, as a chair or airplane seat, walking over 1/4 mile, standing or climbing stairs.  L hip limited motion precludes stooping or crouching.  Hip pain occurs in 10 - 90 minutes with the above activities.  Anti-inflammatory meds and ASA have not been remedial.  Narcotics preclude cognitive function.

*Id.*

On December 29, 2003, Dr. Tohidi stated in a letter to Administaff that Plaintiff remained under his care for severe osteoarthritis.  Dr. Tohidi repeated his statement of Plaintiff's physical limitations and stated that Plaintiff "remains incapable of performing his regular work, as described to me in a letter from Mary Beth Carney (General Counsel and VP Administration, Morpho Technologies)." *Id.* at 1320.

On January 2, 2004, Plaintiff started a business called "Todd Nash Financial Planning." *Id.* at 1596.  Later in 2004, LINA reported in its claim file that Plaintiff's "actual occupation of a 'financial planner' ... was assessed [in the Dictionary of Occupational Titles] as sedentary in physical level ... [w]hich requires mostly sitting, may involve standing or walking for brief periods of time." *Id.* at 2091-92.  Plaintiff subsequently reported to LINA that he was "not doing much with [his financial planning business]....  [He] can't sit down [to] work consistently in position - causes pain." *Id.* at 2197.

On January 14, 2004, Dr. Tohidi again saw Plaintiff for re-examination and refill of Vicodin.  Dr. Tohidi reported that Plaintiff's condition was unchanged and stated that Plaintiff has "limitations of sitting" to "about 30 minutes" and "limitation in mobility, such as prolonged standing or walking." *Id.* at 2280.  Dr. Tohidi stated: "Since he is presently taking narcotic analgesics periodically, this is an issue that likely will be continuous on a long-term

basis as part of the treatment for him.  He is limited as far as cognitive functions are concerned in regard to the effect of narcotic analgesics." *Id.*

On January 16, 2004, Dr. Tohidi completed a second LINA Physical Abilities Assessment form, reiterating his prior opinion that Plaintiff's sitting, standing and walking were each limited to less than 2.5 hours per eight-hour workday.

In a note in LINA's claim file dated January 21, 2004, LINA's Nurse Case Manager Dana Edson stated that LINA learned that Plaintiff's employer terminated Plaintiff because Plaintiff "cannot perform essential job functions."  *Id.* at 1368.  In the same claim file note, Edson indicated that she spoke with Plaintiff and with Dr. Tohidi, who each repeated their statements concerning Plaintiff's diagnosis and restrictions.  The note states:

> Allergic to aspirin products, but does take vicodin, but then can't drive or do anything that takes thinking.  Only takes if can't manage by changing activity, i.e. laying down.  Sitting for 15 min hurts, sometimes can go an hour & ½ at home can slouch & lay down when pain arises.  Always changing what he does, walking, laying, sitting.

*Id.*

LINA's claim file contains the following note from a LINA representative dated January 27, 2004: "39 yr old male [diagnosed] with osteoarthritis in Lt hip, [claimant] currently getting conservative [treatment] and still unable to work.  Per [LINA Nurse Case Manager], Dana, medical is supportive thru STD term."  *Id.* at 2090.

On January 29, 2004, a vocational rehabilitation counselor for Defendant wrote to Morpho's Human Resources Manager and stated:

> We are hoping that it may still be possible to consider accommodations or job modifications for Mr. Nash, that would allow him to return to work in his own position or in an alternative position ... with your company.  Would you please review these functional abilities, and let us know if there is any possibility of accommodating him?

(PTO Ex. D at 579, ECF No. 65).

On January 30, 2004, LINA sent Plaintiff a letter indicating that LINA had received Plaintiff's application for LTD benefits under the Policy.  LINA stated that, pursuant to the Policy, LTD benefits "are reduced by any other benefits you ... receive ..., including Social Security Benefits....  [Y]ou must fully cooperate with us regarding the status of these benefits.

Your lack of cooperation may result in a reduction of your Disability benefits by an estimated amount that we will assume you are receiving." (PTO Ex. C at 1324, ECF No. 80-1).

On February 9, 2004, Morpho informed LINA that Morpho could not sufficiently modify or provide further accommodations to Plaintiff's job that would enable Plaintiff to perform it and Morpho had no other alternative jobs that Plaintiff could perform.

On March 6, 2004, LINA's claim file notes state:

Symptoms support [diagnosis]: Yes - [Claimant] has severe pain in left hip w/limited range of motion. Pain upon extended sitting, walking, and standing.... Appropriate [treatment]: Yes - [Attending Physician]: Dr. Tohid[i]. [Claimant] has [received] pain medication w/cortisone injections. Surgical maybe inevitable - however [Claimant] is wanting to prevent that and undergo conservative treatment initially.... [Claimant's] position with the Company requires his presence in the Company's offices on a regular basis and **requires travel to potential customers**. Traveling 25-50%.... Medical Documentation in file already notes a functional deficit that is keeping the [Claimant] from extended times of sitting. [Claimant] needs the ability to change positions frequently and to lie down frequently when needed.... Recommend approval of benefits.

*Id*. at 2091-92.

On March 12, 2004, a LINA representative stated in the claim file:

I agree with approving this claim. [Claimant's] occ[upation] requires 25-50% travel, which is not unusual for this position.... [Employer] is unable to accommodate. Medical is supportive of [Claimant] being unable to sit, stand or walk more than occ[asionally] as [Claimant] has bone on bone pain with movement and requires to lay down to relieve.

*Id*. at 1971.

On March 16, 2004, LINA sent Plaintiff a letter which stated:

We are pleased to advise you that your claim for Long Term Disability ... benefits have been approved.... To qualify for benefits under your Long Term Disability ... contract, during the first 24 months, you must be unable to perform the essential duties of your occupation. Thereafter, you must be unable to engage in the essential duties of any occupation to qualify for benefits.... We will be requesting periodic updates on the status of your disability and we reserve the right to have you examined by a physician of our choice.

*Id*. at 287-88.

On April 9, 2004, a LINA representative stated in the claim file:

Left hip limited motion precludes stooping or crouching. Hip pain occurs within 10 - 90 minutes with the above activities, sitting for prolonged periods, walking over 1/4 mile, standing and climbing stairs.

Current Treatment Plan/Provider's Estimated [return to work] date: Claimant

> continues to receive treatment for osteoarthritis of the left hip. Claimant has severe left hip pain when sitting in a confined position such as in a chair or airplane seat, walking over 1/4 mile, standing, and climbing stairs. Anti-inflammatory medicines have not provided relief of his pain. He has been prescribed narcotic pain medication that precludes cognitive function.
>
> Future Treatment Plan: the eventual treatment for claimant per [Dr. Tohidi] is a total hip replacement which has a finite life and obviously because of his age, that treatment has been reserved to be applied in the future.

*Id.* at 2975-76.

On May 27, 2004, Plaintiff refilled his prescription for 50 tablets of Hydrocodone (Vicodin).

On June 1, 2004, Plaintiff informed LINA that the Social Security Administration had found Plaintiff disabled under its definition and awarded Plaintiff monthly Social Security Disability Insurance benefits.

On October 20, 2004, a LINA representative stated in the claim file: "Medical supports occasional sit/stand/walk only with severe [Osteoarthritis] of hip with future hip replacement surgery not yet scheduled due to young age. He has license to [work in] financial planning and may have trans[ferable] skills to other work not requiring travel." *Id.* at 1899. The October 20, 2004 claim file note indicates that a LINA representative spoke with Plaintiff, who "advised that he last saw Dr. Tohidi in May 2004. [Plaintiff's] insurance is requiring a referral for add[itional] visits. He says he cannot do anything for long periods of time such as sit at computer.... [Plaintiff] [p]lans on seeing the new [primary care physician] 11/04 and get referral to see Dr. Tohidi by 12/04." *Id.* at 1901. The "provider's estimated [return to work] date" is listed as March 29, 2006. *Id.* at 1900.

On October 29, 2004, a LINA representative stated in the claim file:

> The claimant has now been off work from his last position for over 1 year, but has started his own business after going out on disability. He states that he has cognitive difficulties from his narcotic medications.... It is unclear how he is impaired from cognitive tasks ... and no cognitive testing was found in the file to document any difficulties.... [Plaintiff] has an any occupation date of 3/29/06. The earnings for the own occ[upation] definition of the contract would be 80 percent of the BME of $12,618.66, o[r] $10,094.93 a month.

*Id.* at 1897. The LINA representative wrote to LINA Nurse Case Manager Donna Simmons: "[Dr. Tohidi] has the claimant on narcotic meds, but it appears that this is all he plans to do

indefinitely.  No surgery planned, or mention of other med trials.  Can you review the treatment plan and duration guidelines[?]"  *Id.* at 1896.

On November 3, 2004, a LINA representative wrote in the claim file:

> Will eventually perform hip replacement - but wants to delay as long as possible because the first only last around 20 yrs. & 2nd replacement is much more difficult. 3rd is very high risk.  So he & ... Dr. Tohidi have decided to delay as long as possible, realizing the first replacement is inevitable.

*Id.* at 2180.

On November 8, 2004, Plaintiff saw his new Primary Care Physician, Stacey Lin, M.D. Dr. Lin noted on musculoskeletal examination, "tenderness to palpation, not only on that left hip around the femoral head but his range of movement is only able to lift his knee up off the table about five degrees." *Id.* at 2304.

On December 13, 2004, LINA sent Dr. Tohidi a letter requesting a copy of Plaintiff's medical records from "1/04 to the present" and asking him to complete LINA's Physical Abilities Assessment form. *Id.* at 2176.

On January 4, 2005, Dr. Tohidi examined Plaintiff and reported:

> [Plaintiff's] hip discomfort and pain remain the same.  He has difficulty sitting and has developed more stiffness to his hip.  He is essentially unable to sit normally in a chair and has to sit more or less with his hip flexed no more than about 50 degrees.
>
> His gait remains antalgic, and he does limp because of the painful left hip. Indeed, range of motion has lessened and he does elicit significant pain with any active or passive motion.
>
> He is managing his pain on a conservative level, and obviously he will require a total hip replacement in the future when his pain becomes more or less unbearable....
>
> He will need to be followed periodically, and I would like to see him again in six months or anytime sooner if his pain would require a more definitive treatment.

*Id.* at 2279.

On January 5, 2005, Plaintiff refilled his prescription for 60 tablets of Hydrocodone (Vicodin).

On March 31, 2005, Dr. Tohidi sent LINA a completed "Supplementary Disability claim form." *Id.* at 2170, 2738-39.  Dr. Tohidi stated that Plaintiff was "unchanged";

Plaintiff's "physical impairment" was "[s]evere limitation of functional capacity; incapable of minimal (sedentary) activity," "limited range of motion in left hip precludes ability to perform work activity without significant pain," and "prescribed narcotic pain medication precludes cognitive function"; "patient continues to be disabled for any occupation"; Plaintiff was not a candidate for rehabilitation services; and Plaintiff's job could not be "modified to allow for handling with impairment." *Id.* at 2738-39.

On August 26, 2005, Robert Eccles, a LINA Case Manager, sent Plaintiff a letter which summarized the Policy's definition of "Disability," and stated: "Since your claim is approaching the 24 month point, we have begun investigating your claim to determine if you are eligible for continuing benefits. This evaluation includes requesting information from both you and the physicians who treat you." *Id.* at 2154.

On August 30, 2005, Eccles sent Plaintiff a letter referencing a phone call Eccles received from Plaintiff earlier that day. Eccles stated: "You were correct, the Any Occ[upation] provision starts 30 months into the claim, which will be on 3/29/06. We start o[u]r investigation six months before that date...." (PTO Ex. D at 1019, ECF No. 70).

On August 30, 2005, at Eccles' request, Plaintiff faxed his 2004 tax returns to LINA.

On September 1, 2005, Plaintiff received a letter from Dr. Tohidi, announcing to all his patients that he was relocating his practice effective October 1, 2005.

On September 23, 2005, Plaintiff advised LINA that Dr. Tohidi was in the process of moving his medical practice from San Diego to Georgia, and provided LINA with Dr. Tohidi's new phone and fax numbers. Plaintiff told LINA that "due to [Plaintiff's] HMO, it may take him a while to get a new specialist as they are not referring to specialists very often. [Plaintiff] said if [LINA] need[s] a[] physician statement, to give [Plaintiff] some lead time for this request." (PTO Ex. C at 1890, ECF No. 82).

On September 23, 2005, Plaintiff mailed LINA a completed "Disability Questionnaire & Activities of Daily Living" form. *Id.* at 1594. Plaintiff stated that his physical condition which prevented him from working was "severe osteoarthritis in my left hip." *Id.* at 1595. Plaintiff stated: "Pain in my Left Hip precludes me from staying in the same or similar position

for long enough to accomplish tasks associated with an occupation.  The limited movement of my hip causes pain and limits my activity.  Pain pills limit my cognitive ability to work." *Id*. Plaintiff stated that he could drive about 45 minutes; he used "[h]andrails for stairs, various items for getting in & out of seating/laying type furniture"; he used the computer daily; he cooked 15 minutes daily; he shopped one hour a day, three days a week; he read or watched television five hours daily; he attended to his children and all of his personal needs; and he took 20-minute, 100-yard walks three to four times a week.  *Id*.  Plaintiff stated that he received $3060 monthly in Social Security benefits.

On October 4, 2005, Eccles mailed Plaintiff a letter stating that LINA had been unsuccessful in obtaining updated medical information from Dr. Tohidi. Eccles stated: "Please contact your physician and ask that he cooperate with us and respond to our requests as soon as possible.  If we do not receive the requested information by October 18, 2005, we will make a decision based on the information in our file."  *Id*. at 171.

On October 11, 2005, LINA's investigator, PhotoFax, Inc. ("PhotoFax"), sent a report to LINA concerning Plaintiff which stated:

> We have completed our background check investigation and have found no evidence of your subject working as a financial planner.... Sources advised that your subject is currently receiving social security disability and he is known to be unemployed at this time.  Furthermore, one source indicated that your subject and his wife recently returned from a summer vacation where they visited various parts of California, Chicago, and Paris.

(PTO Ex. D at 705, ECF No. 67).

On October 19, 2005, Eccles wrote in the claim file:

> Spoke [with Plaintiff] regarding Tohidi's records.  He said he was hoping to have the AP form today and would fax it to us.... [Eccles] told [Plaintiff] [LINA] also needed [Dr. Tohidi's] office notes and [Plaintiff] said [LINA] should have them, as [Plaintiff] only sees Tohidi when he is required to get a form filled out.  [Eccles] asked who [Plaintiff] would see now that Tohidi has moved to Georgia ... and he said he didn't know.  [Plaintiff] isn't in a hurry to get a new AP as he doesn't need regular [treatment].

(PTO Ex. C at 169, ECF No. 77-1).

On October 19, 2005, Plaintiff faxed LINA a completed Physical Abilities Assessment form which was signed by Dr. Tohidi and dated October 19, 2005.  Dr. Tohidi stated:

> [Plaintiff] has severe L hip pain when sitting in a confined area as a chair or

airplane seat, walking over 1/4 mile, standing and climbing stairs. Lt hip limited motion precludes crouching. Hip pain occurs in 10-90 minutes with the above activities. Anti inflammatory meds and ASA have not been remedial. Narcotics preclude cognitive function.

*Id*. at 2741. Dr. Tohidi stated that Plaintiff was limited to sitting, standing and walking "occasionally" (less than 2.5 hours) in an 8-hour work day; Plaintiff could tolerate no climbing, crawling, crouching, stooping, working extending hours, and reaching below the waist; and Plaintiff's "lifting" was limited to the "sedentary" level. *Id*. at 2740-41.

At LINA's request, PhotoFax conducted surveillance of Plaintiff in San Diego over a five-day period from October 25, 2005 through October 29, 2005, for eleven hours each day.

On November 7, 2005, PhotoFax sent LINA an 18-page report of the surveillance conducted on Plaintiff. PhotoFax summarized the report as follows:

We have completed this portion of our investigation and have found the claimant to be active. On the first four days of surveillance, the claimant performed yard work around his residence and assisted laborers who were installing a retaining wall. On the third day, the claimant went to a winery where he appeared to work for four hours as an employee. On the fifth day, the claimant and his family went to the San Diego Zoo and then returned home where he visited with his neighbors. Specifically, we have obtained two hundred and forty minutes of film of the claimant walking, bending, pushing a stroller with two boys inside up and down hills, picking a boy up and placing him on a railing, picking up large pieces of wood, drywall and debris, and pushing a wheel barrel up and down an incline. In addition, we have obtained film of the claimant working at a winery and moving large bins and other miscellaneous items.

*Id*. at 1953 (emphasis omitted).

On November 28, 2005, Eccles faxed to Plaintiff's home fax number a letter acknowledging receipt of Dr. Tohidi's Physical Abilities Assessment form. Eccles indicated that he had twice requested Dr. Tohidi's office records concerning Plaintiff's treatment from February 1, 2004, but had received no response from Dr. Tohidi. Eccles stated: "We ... also need medical records from your attending physicians concerning your treatment." *Id*. at 1937.

On November 29, 2005, Plaintiff left Eccles a voice message providing the phone numbers for Drs. Tohidi, Lin and Agir, and stated that Eccles "could contact them to get the medical records from them directly." *Id*. at 1935.

On November 30, 2005, Eccles faxed a records request to Drs. Tohidi, Ajir and Lin. On December 5, 2005, Dr. Ajir responded with the notes for his last physical examination of

1   Plaintiff on November 19, 2003 and stated that he no longer treated Plaintiff.

2          On December 6, 2005, LINA's Nurse Case Manager Donna Simmons called Plaintiff.

3   Simmons wrote in the Claim File:

4          [Claimant] has not seen Tohidi since 3/31/5, Tohidi completed 10/19/5 PAA
           without seeing [claimant] for 7 months. Per [claimant] phone call – his ortho dr
5          – Dr. Tohidi has moved to Georgia and [claimant] has not found another
           ortho/md.
6
           From a Medical documentation perspective – medical not supportive as we are
7          lacking any objective findings for more than 2 yrs.  NO ROM values, no current
           xrays of the affected hip.  The surveillance is extensive and ... completely
8          contradicts what [claimant states] he is incapable of performing.

9   *Id*. at 88.

10         On December 13, 2005, LINA's Misty Ferris wrote a "Second Eye Review," which

11  stated:

12         I agree with denial.... [T]here is no current medical of treatment plan apparently
           on file.  From activity level he is consistently performing at medium and heavy
13         and could even sit in long car ride to zoo.  His occ was sedentary and there is
           nothing to support TD his or any occ at this point.
14
    *Id*. at 1873.
15
           On December 13, 2005, Eccles sent Plaintiff a letter which began: "We carefully
16
    reviewed your claim for benefits under the above captioned policy and must deny your claim
17
    for benefits beyond 11.30.2005."  *Id*. at 2710.  The six-page letter quoted the Policy definition
18
    of "Disability/Disabled" and "Regular Occupation."  *Id*.  Eccles stated:
19
           We reviewed the following information in conducting our review:
20
           1. A Physical Ability Assessment from Dr. Tohidi completed 10.19.05
21
           2. An Attending Physician statement completed by Dr. Tohidi on 3.31.05
22
           3. Disability Questionnaire signed 9.22.05
23
           5. Surveillance conducted from 10.25.05 through 10.29.05
24         ....

25         We attempted to get office notes from Dr. Tohidi and he has not responded to
           our request.  We also attempted to get office notes from Dr. Ajir and Dr. Lin.
26
    *Id*. at 2711.  Eccles summarized the surveillance footage and then stated:
27
           The person conducting the surveillance said you walked with a normal gait and
28         exhibited no observable limitations in your motions while working, walking,
           bending and lifting....

> After review of the medical information in your claim file and the surveillance tapes, it appears you have the capabilities [of] working in your normal occupation, as defined in the national economy and in fact, may be working in another occupation at Witch Creek Winery.
>
> We have no medical evidence to show that you are disabled at this time from working in your Regular Occupation and therefore, your benefits are denied.

*Id.* at 2713. Eccles told Plaintiff he could submit a "Request for Reconsideration (Appeal)" within 180 days which could include "written comments as well as any new documentation you wish us to consider." *Id.* at 2714.

On December 14, 2005, Plaintiff sent a letter to Eccles requesting a copy of the surveillance footage and all information that Defendant used to determine Plaintiff's eligibility for benefits. Eccles responded by sending a copy of LINA's claim file and the video CDs containing the 240 minutes of surveillance footage.

On December 19, 2005, Plaintiff saw his primary care physician, Dr. Lin. Dr. Lin stated:

> The patient continues to have a lot of pain, particularly decreased range of motion, only about 5 degrees to lift his knee up off the table. There is no swelling or edema. He is still on the Vicodin. He avoids taking this medication due to decreased mentation and inability to drive on the medication. The pain is off and on. He has good days and bad days. What is helpful is if he reclines. Sitting is the worst in that he has pain as well as decreased sensation after about 15 minutes ... particularly worse with different activities such as showering or putting on his socks.

*Id.* at 2302. On physical examination, Dr. Lin stated, "tender along that hip, particularly the left hip." *Id.* Dr. Lin's "[a]ssessment" was "history of severe osteoarthritis." *Id.* Dr. Lin stated that, "[w]ith Dr. Tohidi gone, will refer to Dr. [Patrick] Padilla." *Id.* at 2302.

On December 19, 2005, Plaintiff refilled his prescription for 50 Hydrocodone (Vicodin) tablets.

On December 21, 2005, Eccles sent Plaintiff a letter denying Plaintiff further eligibility for "Waiver of Premium" on Plaintiff's group life insurance policy also insured through Defendant because the Waiver of Premium is only applicable when the insured is disabled. *Id.* at 1532.

On January 4, 2006, Plaintiff saw Dr. Padilla. On physical examination, Dr. Padilla stated: "Left hip range of motion - Forward flexion approximately 45°, 0 internal or external

rotation, abduction of approximately 10° with minimal hip extension." *Id.* at 2324. Dr. Padilla

stated that an X-ray taken on January 4, 2006 "[s]hows severe degenerative arthritis with joint

space narrowing, osteophyte formation." *Id.* Dr. Padilla's impression was "[s]evere left hip

osteoarthritis." *Id.* Dr. Padilla stated:

> Based on the patient's age and severity of the disease I feel that it is likely that
> he is not going to gain a significant time period with ... conservative or
> minimally invasive [treatment] efforts.  My recommendation would be to
> undergo a surface replacing hip arthroplasty rather than the conventional total
> hip arthroplasty.  I feel that this is a bone sparing procedure and may provide the
> patient with greater long term options.  Currently this procedure is only done in
> a limited number of institutions.

*Id.*

On February 9, 2006, Plaintiff saw James Helgager, M.D., an orthopedic specialist. Dr.

Helgager stated:

> Since being seen by Dr. Tohidi, the patient has had one cortisone injection to his
> hip performed by Dr. Tohidi in his office.  He has tried some
> anti-inflammatories which actually have not worked well.  The patient is not
> able to take aspirin, so he is currently managing his condition with activity
> modification and Vicodin.  The patient is generally doing okay.  He has been
> well counseled in the past regarding the pros and cons of total hip replacement
> in regards to his age and options of treatment.

*Id.* at 2326.  Regarding his physical examination of Plaintiff, Dr. Helgager stated:

> Patient walks with minimal antalgic gait on the left.  He has marked restriction
> of left hip motion with flexion about 70 degrees, minimal rotation, abduction 10
> degrees, adduction 10 degrees.... There is evidence of prior ACL reconstruction
> with long midline incision with obvious knee instability.  The patient is not able
> to sit without reclining back because of the stiffness of his left hip.

*Id.* Dr. Helgager read the films of Plaintiff's January 2006 X-rays as revealing "advanced

osteoarthritis of the left hip." *Id.* Dr. Helgager's assessment was "advanced osteoarthritis left

hip." *Id.* at 2327. Dr. Helgager stated that he "would not recommend total hip replacement

at this time," but he discussed with Plaintiff alternatives for future hip surgery. *Id.* Dr.

Helgager stated that he "will see the patient in a year with x-rays," and "[p]atient is not capable

of working at his previous job because he is unable to sit either in a chair or plane because of

pain and because his hip is so stiff he is not able to sit upright and must recline." *Id.*

On February 13, 2006, Plaintiff saw Dr. Lin.  Dr. Lin stated that "there has been no

significant change in the patient's condition at least from January 2005.... It looks like there

has been no change from his previous visit with Dr. Tohidi." *Id.* at 638.  Dr. Lin stated:

> I recommended that the patient stay at his activity level and based on what looks like he is providing me a job description of, it is recommended that he sit most of the time which he is unable to do with his range of motion.  Given his level of pain and limitations, it does not look like he is able to significantly sit, bend, walk, kneel, or reach, and especially any sort of what looks like extended hours.

*Id.* at 639.

On February 23, 2006, Plaintiff called and e-mailed Tom Eichenberg, Vice President of Sales and Marketing at Morpho Technologies to ask whether Morpho had any employment opportunities that would accommodate his limitations.  On February 23, 2006, Eichenberg e-mailed the following response:

> It would be great to have you re-join the Morpho team, but based on the physical limitations that you have described ... I do not see a good fit.  As you are aware, a Vice President level position, as well as any other position in our industry, requires significant time sitting in a chair whether it be in front of a desk, in a meeting room or most importantly on an airplane - as you are aware we are limited to traveling coach class even for international flights.  When it comes to meeting with customers for example - sitting in a slouching position is not acceptable.  A large portion of our business opportunities are based overseas working with customers in Japan and Korea with personal representation being very important.
>
> If we had any position that would work around your limitations they would be at a significant cut in salary (much less than 50%) from what you were making before you left Morpho.  I am sorry to say that it is going to be tough finding an opportunity based on your limitations - definitely anything at a VP salary level.

(PTO Ex. D at 590, ECF No. 65).

On March 16, 2006, Dr. Lin completed a Physical Abilities Assessment form, and limited Plaintiff's activities in a regular 8-hour work day to less than 2.5 hours of sitting, standing, walking, reaching overhead or at desk level and recommended no climbing, balancing, crouching, stooping, crawling, or work of extended hours.  Dr. Lin stated: " Mr. Nash was seen by Dr. Tohidi and is now managed by Dr. Helgager....  His exam is unchanged since my first visit with him.  Essentially, with his L severe hip pain, he cannot sit for a prolonged period of time.  Anti-inflammatories do not help and narcotics affect cognition." (PTO Ex. C at 2442, ECF No. 83-1).

On March 22, 2006, Dr. Helgager completed a Physical Abilities Assessment form and limited Plaintiff's activities on a regular 8-hour work day to less than 2.5 hours of sitting,

standing, walking and kneeling, and no climbing, balancing, crawling, crouching, stooping or reaching below the waist.  Dr. Helgager indicated that these restrictions were supported by objective findings and stated that Plaintiff "has severe L hip pain.  He is not capable of working at his job because he is unable to sit upright and must recline." *Id*. at 2745.

On March 29, 2006, Plaintiff refilled his prescription for 50 Hydrocodone (Vicodin) tablets.

On March 30, 2006, Plaintiff underwent a Functional Capacity Examination conducted by physical therapist Richard S. Carlton.  Carlton stated:

> Reported Functional Tolerances....
>
> Sitting ... Restricted ... Limited by left hip pain.  Needs to frequently change positions.  Cannot tolerate upright sitting.  Must extend left hip.  Estimated tolerance of 15 minutes max in good chair, then [approximately] 10 minutes recurrently.  He must recline, and then notes increased low back pain.
>
> Standing ... Restricted ... Stationary standing maximum is 15 minutes and then he must sit.  The evaluee leans a lot and bears weight mostly on the right when in pain.
>
> Walking ... Restricted ... Flat surfaces are preferred (maximum is a couple of hundred yards), limited by left hip pain.  Inclines are a problem due to shorter step with left leg.  Declines tend to jam the left hip joint....
>
> Activities of Daily Living ...
>
> Driving ... Restricted ... Modified vehicle.  Drives SUV easier to get in/out.  Uses handles to get in.  He reclines seats as best he can while driving.  Wife drives when they are together in car (he then reclines fully)....
>
> Demonstrated Functional Status....
>
> Sitting ... Maximum observed sitting was 30 minutes with recurrent periods of 15 minutes.  All sitting was in a padded adjustable chair.  Mr. Nash leaned backward and generally kept the left [leg] in extension.  Frequent squirming and postural changes were noted.  Left hip pain and low back pain (due to poor seating posture) are limitations.  Sitting upright is very uncomfortable....
>
> Standing ... Maximum observed standing ranged from 10-15 minutes with one extended period of 50 minutes that included periods of leaning against stable objects.
>
> Walking ... Evaluee walks slowly with a limp.  He declined the submaximal treadmill at the end of the evaluation secondary to subjective pain as a result of tasks completed up to that time.

*Id*. at 567-69.  Carlton stated:

> This worker demonstrated inadequate workplace tolerance for resumption of his

usual and customary job duties (at required level of function) with prolonged sitting in meetings and air travel. Workplace tolerance issues were due to somatic complaints as a result of physical exertion as well as sitting and standing.... Based upon [Functional Capacity Evaluation] results, this client has deficits with: workplace tolerance (when considering usual and customary employment), body mechanics (due to left hip), muscular strength and endurance, ROM, symptom control and loss of worker role identification, all of which contribute to diminished productivity below his usual and customary occupation requirements. Even though strength demands [at his occupation] may be negligible most of the time (unless at a trade show), demand for prolonged sitting and standing appear to be excessive in this gentleman's line of work.

Realistically, in terms of strength, this worker is currently functioning at the 'light' physical demand level with push/pull and carrying activities.... Mr. Nash needs to alternate sitting and standing as needed every 15 minutes.... This client does not appear capable of resuming his usual and customary role in the workforce at present.... The question here is how long this evaluee wishes to remain functionally impaired to the degree he is. He is not sure when he will opt for hip replacement, due to concern of the need for additional procedures as he ages.

*Id*. at 570-71.

On March 30, 2006, Plaintiff underwent range of motion testing by a physical therapist who reported the following with respect to the left hip: forward flexion with bent knee 40°; flexion with straight leg 35°; abduction 25°; adduction 15°; internal rotation 20°; and external rotation 15°.

On April 6, 2006, Dr. Helgager performed a "fluoroscopy guided left hip injection" on Plaintiff, and Dr. Helgager stated that "[r]adiographs demonstrate severe degenerative disk disease of the left hip." *Id*. at 2880.

On April 20, 2006, Plaintiff again saw Dr. Helgager. D. Helgager stated that the hip injection "is not helping particularly." *Id*. at 2328. Dr. Helgager stated:

The patient's range of motion reveals that he is able to flex his hip to about 70 degrees. He has about 15 degrees of internal and external rotation. Abduction is 40, adduction 20 degrees....

Patient states, and I would concur, that he has not had any change in his symptoms since January 2005. The patient has not been helped with injections or physical therapy. He continues to take anti-inflammatory medicines. Patient indicates he is not able to do his job because of his inability to sit for long periods of time at a desk or on an airplane. He has pain and because of the lack of motion is unable to sit. The patient is incapable of flexing his hip beyond 70 degrees at this time. He will continue to utilize over-the-counter or prescription anti-inflammatory meds and occasional Vicodin. Vicodin can cause dizziness, and patient should not drive while taking Vicodin. I would suggest the patient delay his surgery if it is conceivable that he is able to carry out his activities of

daily living.... [I]f hip replacement surgery or resurfacing procedure was done he would probably be able to return to his job. The patient will have to make the decision whether he wants to proceed with surgery with this in mind. The patient has a significant allergy to aspirin, and, therefore, should not take anti-inflammatory medicines.

I would recommend that this patient undergo a hip replacement or resurfacing procedure in the future. The timing of the surgery is based on the patient's personal situation. Certainly, his hip arthritis makes him a candidate at this time. He is, however, only 42 years of age, and if it is conceivable to delay the surgery for a decade, that would be best.

*Id.*

On May 15, 2006, Plaintiff submitted his "Request for Reconsideration (Appeal)" to LINA. *Id.* at 458. Plaintiff's appeal totaled 384 pages, and contains the medical records summarized above, as well as other materials, including affidavits from Plaintiff, Plaintiff's mother, and the owner of the winery filmed in the PhotoFax surveillance footage. Plaintiff submitted his analysis and commentary on the PhotoFax surveillance footage and report. Plaintiff submitted job description information from Morpho representatives and general information regarding the job requirements for "executives" from the Department of Labor's Occupational Outlook Handbook and the Occupational Information Network's "O*Net Online." *Id.* at 701, 721.

On May 19, 2006, LINA Nurse Case Manager Donna Simmons wrote in Plaintiff's claim file: "[Physical Abilities Assessment form] gives sedentary capacity. Other med notes reviewed ... are inconsistent with the extensive surveillance footage. Therefore no change to prior decision." *Id.* at 1449.

On May 19, 2006, LINA Claim Manager Scott Allen wrote an "Appeal Referral" in Plaintiff's claim file which stated:

[Claimant]'s occ[upation] is classified as sedentary. Staffed w/[Nurse Case Manager]. Reviewed new medical notes 3/30/06 FCE, 4/6/06 x-ray, 1/4/06 Dr. Padilla, Dr. Helgager's 2/9/06 and 4/20/06 notes. [Physical Abilities Assessment form] gives sedentary capacity. Other medical notes reviewed indicated above are inconsistent w/extensive surveillance footage. Therefore, prior decision remains unchanged.

*Id.* at 1480.

On May 19, 2006, Allen wrote Plaintiff and stated: "We are in receipt of a request for appeal of your Long Term Disability claim.... The appeal request is being referred to our

- 22 -

08cv893-WQH-RBB

Disability Appeals Team.   Any additional information submitted may impact the appeal decision....   It is your responsibility to provide any supporting information to us by June 9, 2006." *Id.* at 1528 (emphasis omitted).

On May 25, 2006, Plaintiff requested a copy of any information added to his claim file since his request of April 24, 2006.

On May 30, 2006, LINA Appeal Claim Manager Medha Bharadwaj wrote Plaintiff stating she would manage Plaintiff's appeal and asking Plaintiff to provide "any additional relevant information which supports your Disability" by June 20, 2006. *Id.* at 1444.

On June 1, 2006, Plaintiff submitted an "addendum" to his appeal, which responded to Simmons' May 19, 2006 note in the claim file. *Id.* at 1434.

On June 9, 2006, Plaintiff refilled his prescription for Hydrocodone (Vicodin).

On June 20, 2006, Bharadwaj wrote the following "Action Plan/Investigation Results" in Plaintiff's claim file:

> I note that [Dictionary of Occupational Titles] indicates occ[upation] is sedentary, however, [claimant] claims his occ[upation] required travel and is light in nature. I will refer file to Alan Ey[] 06/20/06 to review [job description] and DOTs.... Staffed with [Appeal Nurse Case Manager] and it was decided that we need a MD review. Staffed with ANCM and MD and it was found that there were records after denial date, but they were several weeks/mo after denial and nothing around time of denial to support [limitations/restrictions] precluding [claimant] from performing his occ[upation]. Affirm.

*Id.* at 1475.

On June 20, 2006, Bharadwaj wrote to Plaintiff to inform him that LINA would do a "Medical Review" and needed an additional 30 days for this. *Id.* at 1418.

On June 30, 2006, Vocational Rehabilitation Counselor Alan L. Ey completed an "Occupational Review" of Plaintiff's occupation for LINA. *Id.* at 1419.   Ey stated: "In conclusion, it is within reasonable vocational certainty that the claimant's occupation as a vice president is performed at the light exertional level.   While the essential job functions do not exceed the sedentary exertional level, the activity (travel) necessary to perform those functions exceeds sedentary work." *Id.* at 1420.

On July 7, 2006, Bharadwaj stated in Plaintiff's claim file:

> Dr. Taylor's write up.   New medical includes an exam by [Primary Care

Physician] 3 weeks after denial.  Also includes notes from orthopedist of January 2006.  No notes are provided from physical, PT, or anywhere else that gives info of deficits on or around denial date.  Although surgeon recommends surgery 6 weeks after denial, the records do not support severity at the denial date or clinically measurable information around denial to support [limitations and restrictions] of off work.  In absence of documentation, does not support.

*Id.* at 1475.

On July 10, 2006, Bharadwaj sent a letter to Plaintiff which stated that LINA "must affirm our previous denial of your claim."  *Id.* at 1414.  Bharadwaj stated:

After review of the entirety of the medical information in your file, our medical director noted that most of the medical information provided were several years old and prior to when your Disability benefits ended.  Our medical director noted that you saw various physicians [f]rom December 2005 to April 2006 and also underwent a [Functional Capacity Examination] in March 2006.  However this information is several weeks to several months after your Disability benefits ended and does not provide evidence of continuous Disability as of November 30, 2005, when your benefits ended.  Our medical director also stated that although surgery was recommended 6 weeks after your benefits ended, the medical records in [the] file do not support [the] severity of any condition as of November 30, 2005 that would support limitations and/or restrictions precluding you from performing your occupation....

Disability is determined by medically supported limitations and restrictions which would preclude you from performing the duties of your light occupation as a Vice President.  The presence of a condition, diagnosis or treatment does not equate [to] disability under the plan.  While the documentation on file described your conditions, it does not provide clinical findings that would support the severity of your condition and functional deficits that would preclude you from performing your occupation as of November 30, 2005, when your Long Term Disability benefits ended.  As such, we are reaffirming our previous denial decision of December 13, 2005 within the meaning and terms of your group Long Term Disability plan.

*Id.* at 1415.  The July 10, 2006 denial letter stated that Plaintiff could "request a review of this decision" within 180 days of receipt.  *Id.*  The letter stated: "In addition to any written comments, your request for review must include new documentation you wish us to consider."  *Id.*

On July 17, 2006, Plaintiff requested a complete copy of his administrative record.

On July 18, 2006, Plaintiff faxed a letter to Bharadwaj and LINA Senior Appeal Claim Manager Karol Johnson outlining Plaintiff's response to the July 10, 2006 denial letter.

On July 21, 2006, Bharadwaj wrote to Plaintiff asking whether he wished to submit a second appeal.  Bharadwaj stated that any appeal by Plaintiff must be received by January 10, 2007.

On July 24, 2006, Plaintiff wrote to Ey regarding Ey's June 30, 2006 Occupational Review.  Plaintiff stated:

> You were provided with two pieces of information including a Job Description contained in a letter dated 10/9/03 and [Dictionary of Occupational Titles] printouts for Financial Planner; Research and Development; and Vice President.
>
> What you were not provided with is any information on my condition.  I have severe osteoarthritis of my left hip that precludes me from bending my left leg past approximately 40 to 70 degrees.  This prevents me from sitting in an upright position.  I think that you would agree that it is a fundamental requirement for any job position that you have reviewed for my file that I must be able to sit in an upright position and do so for extended periods while working and traveling.

*Id.* at 1397.

On July 24, 2006, Ey sent Bharadwaj a fax which stated that Ey had a phone conversation with Plaintiff on July 24, 2006.  According to Ey:

> I pointed out to [Plaintiff] that the last [s]entence of page two states that the essential job functions do not exceed the sedentary exertional level.  Inherent in the definition of sedentary is the physical demand of sitting for 6 of 8 hours.  Thus, in the course of his duties as a vice president there would be a significant amount of sitting.  Indeed, the air travel requirement would require significant sitting.

*Id.* at 1395.

On September 8, 2006, Plaintiff faxed Bharadwaj and Johnson a letter indicating that Plaintiff had not received a copy of his administrative record, and again requesting it.

On September 28, 2006, Johnson sent Plaintiff a copy of his claim file.

On October 16, 2006, Plaintiff sent Bharadwaj and Johnson a letter requesting additional information, including the identity and credentials of the "medical director" who performed the review referenced in LINA's second denial letter.  *Id.* at 1677.

On October 23, 2006, Dr. Tohidi examined Plaintiff.  Plaintiff's left hip range of motion was: "sitting 45 degrees, flexion 45 degrees, external rotation 0 degrees, internal rotation 0 degrees, abduction 20 degrees, adduction 0 degrees."  *Id.* at 891.  Dr. Tohidi stated that "left hip x-ray shows severe progressive osteoarthritis."  *Id.*  Dr. Tohidi stated:

> [Plaintiff] returns for further evaluation of left hip pain.  I have seen and treated Mr. Nash for severe osteoarthritis of the left hip since 2003.  I have seen him at least six (6) times during ... this period, to date, [and I] am obviously very familiar with his testing, his clinical presentation and significantly limiting symptomatology.  He has followed my medical recommendations and seen me at intervals I have recommended.  The condition of his hip was advanced at the

time of initial evaluation.  I provided him with information regarding various treatments including pain management, activity modifications, hip replacement, their types, complications, risks, limitations and prosthetic life expectancy.... Mr. Nash is allergic to aspirin.  I have prescribed him Vicodin 5/500 to relieve pain.  I have advised him that the side effects of this narcotic pain medication including probable reduction of cognitive ability and ability to concentrate.  I have advised him he should not operate an automobile while taking this medication.  Mr. Nash has a significant functional disability due to existing marked stiffness and pain with activity.  This is noticeable in my examinations of him, in his movement, in the consistency of his reports that I take during each history and follow up visit, and in the pain behavior that I personally witness.

*Id*. at 890.  Dr. Tohidi stated:

The symptoms and significant limitations of Mr. Nash are those that I would expect given his hip illness and they are fully consistent with other patients I see with similar level of hip disease.  Based on my expertise in this specialty, it is my medical opinion that Mr. Nash has demonstrated no malingering during my examinations and interviews of him, and that his complaints, symptoms and signs, are fully consistent with the level of disease he has and with other patients I see who are in the same condition and the same stage of their disease.

*Id*. Dr. Tohidi recounted his measurements of Plaintiff's range of motion in his left hip and stated:

These measurements objectively show that Mr. Nash is incapable of flexing his left hip into an upright sitting position.  This inability to sit upright remains true today.

I have reviewed the medical records provided by Dr. Stacey Lin, dated December 20, 2005, Dr. Patrick Padilla dated January 04, 2006 and by Dr. James Helgager, dated February 9, 2006 and April 20, 2006, including x-rays taken on January 4, 2006.  The January 4, 2006 x-rays, and the observations reported by Dr. Lin's, Dr. Padilla's and Dr. Helgager's notes generally concur with my assessment of Mr. Nash and provide further evidence that Mr. Nash's illness has progressed, as expected, in a degenerative way and shows no sign of improvement since Mr. Nash's office visit with me in January 2005.

Due to the progressive degenerative nature of Mr. Nash's illness, the severity of hip illness has not and could not have improved in the continuous period from September 2003 to January 2006 and beyond.  Additionally, the resulting limitations and restrictions associated with his illness have not been and could not have been lifted in the continuous period from September 2003 to January 2006 and beyond and certainly not on November 30, 2005 or on December 13, 2005....

I have added the underlining in the above passage to emphasize my professional medical opinion because I understand from reading the letter from [Defendant] dated July 10, 2006 to Mr. Nash that [Defendant] has apparently reasoned that since Mr. Nash was not seen during a specific period that he somehow was not disabled or limited and restricted at that time.  This rationale is medically preposterous.

The progressive degenerative nature of Mr. Nash's illness combined with the evaluations of Dr. Lin, Dr. Padilla, Dr. Helgager, and myself, provide

clinical evidence of the continuous severity of Mr. Nash's illness and resulting functional deficits from September 2003 to the present. Specifically the severity of Mr. Nash's illness and resulting functional deficits preclude him from performing the duties of his former occupation as documented in his medical records or any occupation that I can envision. Specifically, in addition to other limitations and restrictions, Mr. Nash is now and has been, continuously from September 2003 to the present, incapable of sitting upright as required by even sedentary work.

Mr. Nash's hip condition in January 2005 would be either the same or worse both clinically and radiographically, in November 2005 and January 2006. Today I have examined Mr. Nash, including x-rays taken in 2003 and January 2006 and the degeneration of his hip has worsened since 2003.

Due to the degenerative nature of Mr. Nash's illness, routine x-rays and detailed range of motion measurements are not necessary for treatment of his condition unless his condition significantly worsens or until such time [as] the patient is preparing for total hip replacement. Additionally, Magnetic Resonance Imaging (MRI) is not a necessary aspect of treating Mr. Nash's illness.

It is my medical opinion based on my examinations and follow up of Mr. Nash that his restrictions and limitations are:

> sitting – limited to sitting in a reclined position. Restricted to no greater than 30 minutes at a time with 60 minute recumbency in between occurrences;
> forward bent sitting – restricted to no activity of this type;
> standing – restricted to periods no greater than 30 minutes at a time with 60 minute recumbency in between occurrences;
> forward bent standing – restricted to no activity of this type;
> climbing – restricted to no activity of this type;
> balancing – restricted to no activity of this type;
> crawling – restricted to no activity of this type;
> crouching – restricted to no activity of this type;
> stooping – restricted to no activity of this type;
> bending to 90 degrees or greater – restricted to no activity of this type;
> reaching overhead – restricted to periods no greater than 30 minutes at a time with 60 minute recumbency in between occurrences;
> reaching at desk level – restricted to periods no greater than 30 minutes at a time with 60 minute recumbency in between occurrences;
> reaching below waist – restricted to no activity of this type;
> use of lower extremities for foot control – restricted to no activity of this type....

The above limitations and restrictions have been placed upon him since September 2003 and have remained in place, without suspension, to the present. These restrictions will remain in place until Mr. Nash has a total hip replacement surgery and has been adequately rehabilitated.

*Id.* at 884-85.

On October 23, 2006, Dr. Tohidi signed a three-page letter stating that Dr. Tohidi viewed the entire PhotoFax surveillance video of Plaintiff. Dr. Tohidi listed various places in

the video which "show the patient has marked limitations" and then stated:

> The video contains many occurrences of the patient moving with very marked stiffness. The items above are only a few of the many that I observed in the video....

> This patient has significant limitations with sitting. The video does not show the patient sitting except for a few excerpts getting into his car and one clip lasting only a few seconds of him sitting at a table. Also, the patient has limitations with standing. When the patient is shown standing for a few minutes he is often shown leaning against a tree, a wall, or other crutch taking weight off his left leg. The patient is not shown positioning his left hip in a way that is inconsistent with his disease and resulting limitations....

> I have also read the PhotoFax surveillance report that was on the CD with the video. In my opinion, this report was either prepared by an inexperience[d] person and/or a person using descriptions intended to describe the patient's movement in an inappropriate way.... The descriptions are inaccurate and at best misleading.

> The 4 hours of video over 5 days is a small amount of time compared to what I consider to be a normal workweek. The video does not show the patient engaged in the sedentary activities of his former employment, specifically sitting for extended times. However, the video does clearly show that the patient is incapable of moving his left leg into an upright-seated position.

*Id.* at 887-89.

On December 20, 2006, Plaintiff refilled his Hydrocodone (Vicodin) prescription.

On January 4, 2007, Plaintiff, through counsel, submitted his second appeal to LINA. Plaintiff submitted the material discussed above (including the material prepared by Dr. Tohidi on October 23, 2006), a 50-page cover letter, and a 42-page medical chronology.

On February 21, 2007, Bharadwaj sent a letter to Plaintiff's counsel which stated:

> This is in reference to your request for reconsideration of your client's Long Term Disability Claim dated January 04, 2007. Please be advised that we will not be considering another appeal review at this time. The binder of information that you sent for review is a photocopy of Mr. Nash's Long Term Disability file. The new medical information provided was Dr. Tohidi's opinion of the surveillance. This does not change our previous decision as there are no clinical findings to support Dr. Tohidi's opinion. You also sent in some diagrams/articles. While the information you provided is informative, it is not specific to Mr. Nash's abilities to function in the workplace at his occupation as a Vice President from November 30, 2005. Mr. Nash's claim remains closed.

*Id.* at 843.

On February 28, 2007, Plaintiff's counsel sent a letter to Bharadwaj which stated: "Mr. Nash's second appeal includes several medical specialists' examinations, opinions, numerous tests, clinical findings, confirmatory and updated medical information.... Since Mr. Nash has

nothing further to submit that what he has submitted to date, please advise us whether Mr.

Nash has now exhausted his administrative remedies." *Id*. at 2773.

On April 20, 2007, Plaintiff sent a letter to Bharadwaj which stated: "Please explain to

me why [Defendant] invited a second appeal and then refused to consider it.... Also, please

respond to my attorney's letter of February 28, 2007." (PTO Ex. D at 48, ECF No. 58-1).

On June 7, 2007, Plaintiff's counsel sent a letter to Gary Person, LINA's Appeal Claim

Manager, which "confirm[ed] our receipt of [Person's] call on May 30, 2007." *Id*. at 43.

Plaintiff's counsel stated:

> I appreciate your attention to this since the contact by the California Department
> of Insurance after our communication to them of our difficulties with LINA
> (through Ms. Bharadwaj) related to Mr. Nash's second appeal which LINA
> received on January 9, and regarding her complete nonresponsiveness thereafter
> to our communications.... You asked if it was 'too late' for LINA to review the
> appeal–i.e. whether litigation had already commenced. I confirmed for you that
> Mr. Nash's interests were to try to avoid litigation, and that we had not yet filed
> a lawsuit and would like to avoid it and the needless incurring of attorneys fees
> if possible.

*Id*.

On June 8, 2007, Plaintiff's counsel received a letter from Person dated May 31, 2007,

"confirm[ing] that [Plaintiff] agreed that the claim would be placed in the voluntary appeal

process at this time. It will be assigned to Karen Nichols as the appeal claim manager." *Id*.

at 42. Person stated that LINA's review of the appeal would take 90 days.

On June 14, 2007, Plaintiff saw Dr. Helgager "for reevaluation of [Plaintiff's] left hip."

*Id*. at 40. Dr. Helgager stated:

> Objectively, the patient has significant limitation of hip motion. He only flexes
> to about 60 degrees. He has full extension. There is minimal rotation.
> Abduction and adduction about 10 degrees.... X-rays reveal advanced
> osteoarthritis left hip. X-rays are a bit worse than those x-rays 01/2006. The
> patient's femoral head is still round. Joint space superiorly is essentially
> obliterated.

*Id*.

On June 26, 2007, Dr. Helgager completed a Physical Abilities Assessment form. Dr.

Helgager stated that Plaintiff had the following limitations in an eight-hour workday which

were supported by objective findings: less than 2.5 hours sitting, standing and walking, and

no ability to work extended hours, climbing, balancing, kneeling, crawling, crouching,

1    stooping, or reaching below the waist. *Id.* at 38.  Dr. Helgager stated:

2           Mr. Nash is not capable of sitting in an upright position due to very limited
       range of motion in his left hip.  Mr. Nash's osteoarthritis causes severe pain
3       when attempting to move his hip to the limits of his range of motion, standing
       for more than a few minutes, and walking distances of 1/4 mile or more.  Mr.
4       Nash should limit his activities that cause pain.  Mr. Nash uses narcotic pain
       medication to manage his pain.  This pain medication will interfere with his
5       cognitive abilities....  Mr. Nash's current limitations/restrictions are consistent
       with those placed on him by Dr. Tohidi in November of 2003.  Due to the
6       progressive nature of Mr. Nash's illness, these limitations/restrictions have not
       changed from the time that Mr. Nash was under the care of Dr. Tohidi to the
7       time under which he came under my care.

8    *Id.* at 39.

9           On June 26, 2007, Plaintiff's counsel faxed LINA a copy of Dr. Helgager's updated

10   medical record related to the June 14, 2007 orthopedic examination and June 26, 2007 Physical

11   Abilities Assessment form.

12          On July 2, 2007, Plaintiff's counsel sent LINA Plaintiff's updated prescription refill

13   records.

14          On July 12, 2007, Harvey Popovich, M.D., who is board certified in Family Practice

15   and Occupational Medicine and is associated with "Physicians' Review Network," prepared

16   a report for LINA following a review of Plaintiff's medical records and the PhotoFax video

17   surveillance.  (PTO Ex. C at 2687, ECF No. 84).  Dr. Popovich stated that he did not examine

18   Plaintiff or speak to any of Plaintiff's medical providers.  Dr. Popovich stated:

19          Based upon review of the medical information provided including the ...
       surveillance videos, the Restrictions and Limitations are not supported by
20       objective evidence for the period of 11/30/05 and through the present time.  The
       ... surveillance video is not indicative of any restrictions with respect to Mr.
21       Nash's physical abilities.  Mr. Nash is observed engaging in multiple activities
       of daily living, including walking, sitting, standing, driving, lifting, carrying,
22       pushing and pulling without limitation.   Based on this, Restrictions and
       Limitations are not supported....
23
       I am unable to agree with the attending physician with respect to Mr. Nash's
24       activities.  The attending physician contends that Mr. Nash is unable to perform
       his usual job activities due to inability to sit for prolonged periods.  However,
25       sitting involves minimal hip joint loading relative to the standing, walking,
       lifting, pushing, pulling and carrying activities in which Mr. Nash is observed
26       to participate in the ... surveillance videos....

27          The [range of motion]/Restrictions and what is seen on the video do not show
       that the claimant is unable to sit.  Based upon the review of the records provided,
28       including the ... surveillance videos, an inability on the part of Mr. Nash to sit
       is not supported.  Mr. Nash is observed sitting and driving in several instances

and as stated above, sitting involves less weightbearing of the hip joints than does the other activities in which Mr. Nash is seen to participate over a course of several hours to include standing, walking, lifting, pushing, pulling and carrying.

*Id*. at 2693-94.

On July 18, 2007, LINA's Appeals Claim Manager Karen Nichols sent Plaintiff's counsel a letter.  Nichols stated:

> [A]fter our review of Mr. Nash's file we are affirming our previous denials dated December 13, 2005 and July 10, 2006....
>
> We based our decision to deny your client's benefits after November 30, 2005, on Plan language and all of the documents contained in your client's claim file, viewed as a whole....
>
> For the purpose of this review we will be evaluating whether or not Mr. Nash retained the functional capacity to perform his occupation as explained in the definition of disability [in the Policy].  The records in our file indicate that Mr. Nash's occupation is that of Vice-President of Business Development.

*Id*. at 2700-01.  Nichols stated that LINA reviewed 77 exhibits from Plaintiff's claim file and paraphrased Dr. Popovich's July 12, 2007 report.  Nichols stated:

> The results of [Dr. Popovich's] review indicated that there was no medical provided that documented any significant physical or cognitive limitations that would preclude working activities....  Mr. Nash [was] observed ... engaging in multiple activities of daily living, the limitations and/or restrictions are not supported.  [Dr. Popovich] further opined that although unusual, it is possible to sit with the hip flexed at not more than approximate 45 degrees.
>
> After reviewing all of the available information we determined that there was no new or additional information to consider that would refute the previous decision already made on [your] client's ... file.  Further the information received did not add any further explanation of your client's functionality as of November 30, 2005.
>
> The ... Policy provides that benefits are paid if your client was prevented by Disability from performing the duties of his occupation.  However, the weight of the medical evidence in your client's claim file supports his ability to perform his own work activities, as the medical information does not support any disability that would show that he was not capable of performing his occupation as of November 30, 2005.  Accordingly, no benefits are payable under the Policy as of November 30, 2005.

*Id*. at 2705.

## III.    Standard of Review

The Policy and Plan documents unambiguously grant discretionary authority to LINA, the plan administrator.  (PTO Ex. A at 9, ECF No. 96-1 at 11; PTO Ex. B at B-28, ECF No.

96-1 at 47).  Accordingly, the Court reviews LINA's decision for an abuse of discretion.  *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc).

Where, as in this case, "the entity that administers the plan, ... both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," this "dual role creates a conflict of interest." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).  "[A] reviewing court should consider that conflict [of interest] as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case." *Id.*; *see also Abatie*, 458 F.3d at 965 ("[T]he existence of a conflict of interest is relevant to how a court conducts abuse of discretion review.").  "Simply construing the terms of the underlying plan and scanning the record for medical evidence supporting the plan administrator's decision is not enough, because a reviewing court must take into account the administrator's conflict of interest as a factor in the analysis." *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009) (citing, *inter alia*, *Glenn*, 554 U.S. at 108; *Abatie*, 458 F.3d at 968-69).

In *Montour*, the court stated:

> [T]he [reviewing] court must consider numerous case-specific factors, including the administrator's conflict of interest, and reach a decision as to whether discretion has been abused by weighing and balancing those factors together. Under this rubric, the extent to which a conflict of interest appears to have motivated an administrator's decision is one among potentially many relevant factors that must be considered.  Other factors that frequently arise in the ERISA context include the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts with all of the relevant evidence, and whether the administrator considered a contrary [Social Security Administration] disability determination, if any.

> The weight the court assigns to the conflict factor depends on the facts and circumstances of each particular case....  Our court has implemented this approach by including the existence of a conflict as a factor to be weighed, adjusting the weight given that factor based on the degree to which the conflict appears improperly to have influenced a plan administrator's decision....

> *Abatie* explained that the court should adjust the level of skepticism with which it reviews a potentially biased plan administrator's explanation for its decision in accordance with the facts and circumstances of the case.  If those facts and circumstances indicate the conflict may have tainted the entire administrative decisionmaking process, the court should review the administrator's stated bases

1  for its decision with enhanced skepticism: this is functionally equivalent to
2  assigning greater weight to the conflict of interest as a factor in the overall
   analysis of whether an abuse of discretion occurred.

3  *Id.* (quotation and citations omitted).

4      In *Abatie*, the court stated:

5  The level of skepticism with which a court views a conflicted administrator's
   decision may be low if a structural conflict of interest is unaccompanied, for
6  example, by any evidence of malice, of self-dealing, or of a parsimonious
   claims-granting history. A court may weigh a conflict more heavily if, for
7  example, the administrator provides inconsistent reasons for denial, fails
   adequately to investigate a claim or ask the plaintiff for necessary evidence, fails
8  to credit a claimant's reliable evidence, or has repeatedly denied benefits to
   deserving participants by interpreting plan terms incorrectly or by making
9  decisions against the weight of evidence in the record.

10  *Abatie*, 458 F.3d at 968-69 (citations omitted).

11      "[I]n general, a district court may review only the administrative record when

12  considering whether the plan administrator abused its discretion...." *Id.* at 970. "The district

13  court may, in its discretion, consider evidence outside the administrative record to decide the

14  nature, extent, and effect on the decision-making process of any conflict of interest; the

15  decision on the merits, though, must rest on the administrative record once the conflict (if any)

16  has been established, by extrinsic evidence or otherwise." *Id.* (citation omitted). "In the

17  ERISA context, the administrative record consists of the papers the insurer had when it denied

18  the claim." *Montour*, 588 F.3d at 632 n.4 (quotation omitted).

19      Plaintiff contends that, because LINA failed to make a decision on Plaintiff's second

20  appeal within the time deadlines established by the Plan and by ERISA, "the standard of

21  review is abuse of discretion for LINA's first two denial letters ..., but requires a de novo

22  review of Nash's second appeal and LINA's 7/18/07 final denial." (ECF No. 85 at 41). After

23  review of the record, the Court concludes that any violations of the time limits established in

24  the Plan or the ERISA regulations were insufficient to alter the standard of review. *See Gatti*

25  *v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 982, 985 (9th Cir. 2005) ("[V]iolations of the

26  time limits established in [ERISA regulations] are insufficient to alter the standard of review....

27  [P]rocedural violations of ERISA do not alter the standard of review unless those violations

28  are so flagrant as to alter the substantive relationship between the employer and employee,

- 33 -

1  thereby causing the beneficiary substantive harm.").  The Court reviews LINA's denial of

2  benefits pursuant to the abuse of discretion standard of review described above.

3  **IV.    Market Conduct Examination**

4       Plaintiff requests that the Court take judicial notice of the "Public Report of the

5  Targeted Market Conduct Examination of the Claims Practices of the Life Insurance Company

6  of North America, ... as of June 20, 2006" ("Public Report"), prepared by the California

7  Department of Insurance Market Conduct Division.  (PTO Ex. G at 1, ECF No. 96-1).  In the

8  Public Report, the California Department of Insurance stated that its examiners reviewed 224

9  LINA claim files and found 57 claim handling violations of the Claims Settlement Practices

10 Regulations and/or the California Insurance Code.  Among the alleged violations were that

11 LINA: "unreasonabl[y] ... require[d] claimants to perform their own functional testing to

12 receive benefits"; "failed to consult with a health care professional who had appropriate

13 training and experience in the field of medicine involved in the medical judgment"; "failed to

14 have medical personnel review test results reflecting the existence of a potentially disabling

15 condition that came in after the denial"; "ignored substantial information that came into the file

16 after the initial denial"; "[f]ailed to provide complete information in the file to the health care

17 expert performing peer review of the medical records"; "[f]ailed to investigate how the

18 claimant could perform his/her own occupation given the restrictions applied."  *Id.* at 7-9, 13-

19 14.

20      Plaintiff also requests that the Court take judicial notice of an August 18, 2009

21 Stipulation and Waiver between LINA and the California Department of Insurance.  (PTO Ex.

22 H, ECF No. 96-1).  The Stipulation and Waiver requires LINA to comply with terms and

23 conditions, including the payment of a $600,000 penalty, and states that it "does not constitute

24 an admission of liability, violation or wrongdoing by LINA," *Id.* at 3.

25      "The district court may, in its discretion, consider evidence outside the administrative

26 record to decide the nature, extent, and effect on the decision-making process of any conflict

27 of interest...."  *Abatie*, 458 F.3d at 970; *cf. Glenn*, 554 U.S. at 117 ("The conflict of interest at

28 issue here, for example, should prove more important (perhaps of great importance) where

1  circumstances suggest a higher likelihood that it affected the benefits decision, including, but

2  not limited to, cases where an insurance company administrator has a history of biased claims

3  administration.").

4      The Court has considered the Public Report and the Stipulation and Waiver solely for

5  the purpose of deciding the nature, extent, and effect on the decision-making process of

6  LINA's conflict of interest.  However, the Court assigns these documents little or no weight

7  because, as stated in the Public Report, "[a]ny alleged violations identified in this report and

8  any criticisms of practices have not undergone a formal administrative or judicial process."

9  (PTO Ex. G at 3, ECF No. 96-1).

10 **V.    Decision to Deny Benefits**

11     In LINA's first denial letter, dated December 13, 2005, LINA relied heavily upon the

12 surveillance footage in stating LINA's reason for its decision.  In LINA's July 10, 2006 letter

13 affirming the denial, LINA relied upon the opinion of its "medical director" that Plaintiff's

14 medical evidence from "December 2005 to April 2006" is "several weeks to several months

15 after your Disability benefits ended and does not provide evidence of continuous Disability as

16 of November 30, 2005, when your benefits ended."  (PTO Ex. C at 1415, ECF No. 80-1).  In

17 LINA's July 18, 2007 letter affirming the denial, LINA relied upon Dr. Popovich's review of

18 the surveillance footage and the claim file, and his opinion that, based upon "observation of

19 [Plaintiff in the surveillance footage] ... engaging in multiple activities of daily living, the

20 limitations and/or restrictions are not supported." *Id*. at 2705.  LINA also stated that Plaintiff's

21 newly submitted "information ... did not add any further explanation of [Plaintiff]'s

22 functionality as of November 30, 2005." *Id*.

23     **A.    Surveillance**

24     In *Montour*, the Court of Appeals for the Ninth Circuit concluded that the defendant's

25 "bias infiltrated the entire administrative decisionmaking process, which leads us to accord

26 significant weight to the conflict [of interest]." 588 F.3d at 634.  In support of this conclusion,

27 the court relied upon the district court's finding that the defendant "overstate[d] and

28 over-relie[d] on surveillance of Plaintiff." *Id*. at 633.  The court quoted the district court's

findings:

> Plaintiff was observed over forty daylight hours on four days in November and December 2005.  During this time, he was observed making two twenty minute trips to pick up or drop off his grandchildren from school and one trip of about two and a half hours conducting errands at various stores.  He was also observed to be away from his home on two occasions for about an hour and forty minutes.  During this time, he was observed bending once at the waist and picking up a small bag of medication.

> This observed activity was brief and consistent with Plaintiff's self-reported limitations. Plaintiff admitted that he was able to drive for up to thirty minutes, could walk short distances, and could lift objects lighter than five pounds.  Yet Hartford claimed that Plaintiff's 'self-reported limitations were not consistent with his observed activities.'  Hartford strung together a laundry list of discrete activities observed over the course of four days, suggesting that Plaintiff was capable of sustaining those activities throughout the day, as would be required in a sedentary occupation.  However, that Plaintiff could perform sedentary activities in bursts spread out over four days does not indicate that he is capable of sustaining activity in a full-time occupation.

*Id*. (quotation omitted).

Similarly, LINA overstated and over-relied upon the 240 minutes of surveillance footage of Plaintiff taken over a five-day period.  Based upon LINA's denial letters and Dr. Popovich's report, the surveillance footage was one of the primary reasons–if not the primary reason–for LINA's denial and Dr. Popovich's opinion that "the Restrictions and Limitations are not supported by objective evidence."  (PTO Ex. C at 2693, ECF No. 84).

The surveillance footage does not show Plaintiff sitting, except for a few excerpts of Plaintiff in a car and a brief section when Plaintiff sat at a table at the zoo.  Based upon the undisputed evidence in the record, the longest Plaintiff sat during the surveillance period was during the 37 minute car ride to the zoo and the 43 minute ride home from the zoo.  This is consistent with Plaintiff's statement in LINA's Disability Questionnaire that he could drive for 45 minutes, and Dr. Tohidi's statement to LINA that Plaintiff could not sit in a confined space longer than 45 minutes.  As stated by Dr. Tohidi, Plaintiff "is not shown positioning his left hip in a way that is inconsistent with his disease and resulting limitations," and "[t]he video does not show [Plaintiff] engaged in the sedentary activities of his former employment, specifically sitting for extended times."  (PTO Ex. C at 889, ECF No. 79-1).  As was the case in *Montour*, "that Plaintiff could perform sedentary activities in bursts spread out over [five] days does not indicate that he is capable of sustaining activity in a full-time occupation."  588

F.3d at 634.

Neither Dr. Popovich nor LINA addressed the detailed commentary on the surveillance footage submitted by Plaintiff in his first appeal and by Dr. Tohidi in Plaintiff's second appeal. The record shows that during the drive to and from the zoo, Plaintiff's wife operated the vehicle while Plaintiff, who took one Vicodin tablet prior to leaving for the zoo and another Vicodin tablet while at the zoo, rode in the passenger seat in a reclined position.  Neither Dr. Popovich nor LINA addressed or acknowledged this evidence.

LINA's treatment of the surveillance evidence is a factor the Court considers in determining whether LINA abused its discretion.

**B.    LINA's Medical Reviewers**

In *Montour*, the court stated:

> Another factor is Hartford's decision to conduct a 'pure paper' review in this case, that is, to hire doctors to review Montour's files rather than to conduct an in-person medical evaluation of him.  While the Plan does not require a physical exam by a non-treating physician, in this case that choice raises questions about the thoroughness and accuracy of the benefits determination, as it is not clear the Plan presented Dr. Brown and Dr. Sukhov with all of the relevant evidence. Specifically, neither of Hartford's professional experts mentioned the [Social Security Administration]'s contrary conclusion, not even to discount or disagree with it, which indicates that they may not even have been aware of it.

*Id.* (quotations omitted).

LINA did not exercise its contractual right to hire a physician to examine Plaintiff. Instead, LINA conducted a "pure paper review."  *Id.*  None of LINA's medical reviewers addressed the Social Security Administration's determination that Plaintiff was disabled.  *See id.*  This is a factor the Court considers in determining whether LINA abused its discretion.

There is no evidence that any of LINA's medical reviewers is an orthopedic specialist or has experience with patients who have osteoarthritis of the hip.  *See Kochenderfer v. Reliance Standard Life Ins. Co.*, No. 06-cv-620, 2009 WL 4722831, at *7 (S.D. Cal., Dec. 4, 2009) ("Another of Defendant's decisions indicating a conflict of interest was the retention of Dr. Hauptman to perform the review of Plaintiff's file on appeal.  Although Dr. Hauptman is board certified in internal medicine and gastroenterology, he is not a specialist in diagnosing or treating Plaintiff's particular condition: degenerative arthritis in her hips."); *cf.* 29 C.F.R.

§ 2560.503-1(h)(3)(iii) ("[I]n deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, ... the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment...."). This is a factor the Court considers in determining whether LINA abused its discretion.

LINA's Peer Reviewer, Dr. Popovich, stated that he disagreed with Dr. Tohidi's opinion that Plaintiff cannot sit for prolonged periods because "sitting involves minimal hip joint loading relative to the standing, walking, lifting, pushing, pulling and carrying activities in which Mr. Nash is observed to participate in the ... surveillance videos...." (PTO Ex. C at 2693, ECF No. 84). Dr. Popovich, who is board certified in family practice and occupational medicine, offered no further explanation as to why his opinion contradicted the opinions of each of the orthopedic specialists who examined Plaintiff and viewed Plaintiff's X-rays. In its July 18, 2007 letter denying Plaintiff's second and final appeal, LINA–for the first time–relied upon the above-quoted rationale of Dr. Popovich, as well as Dr. Popovich's statement that "is it possible to sit with the hip flexed at not more than approximate 45 degrees." *Id.* at 2705. Relying upon these new rationales without providing Plaintiff an opportunity to respond is a factor which the Court considers in determining whether LINA abused its discretion. *See Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008) ("[T]he fact that the claims administrator presented a new reason at the last minute bears on whether denial of the claim was the result of an impartial evaluation or was colored by MetLife's conflict of interest. After all, coming up with a new reason for rejecting the claims at the last minute suggests that the claim administrator may be casting about for an excuse to reject the claim rather than conducting an objective evaluation."); *Abatie*, 458 F.3d at 974 ("When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures.... [A]n administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA. This

1  procedural violation must be weighed by the district court in deciding whether [defendant]

2  abused its discretion.").

3          LINA's first two denial letters do not contain a meaningful discussion of the medical

4  evidence, and the final denial letter emphasized Dr. Popovich's report and deemphasized all

5  other medical reports.  This is a factor the Court considers in determining whether LINA

6  abused its discretion.  *See Glenn*, 554 U.S. at 118 ("that MetLife had emphasized a certain

7  medical report that favored a denial of benefits, [and] had deemphasized certain other reports

8  that suggested a contrary conclusion" was a proper factor to consider in determining whether

9  a plan administrator abused its discretion).

10         **C.        Evidence of Continuous Disability as of November 30, 2005**

11         On December 13, 2005, LINA issued its letter informing Plaintiff that it had denied his

12 claim for benefits "beyond 11.30.05."  (PTO Ex. C at 2710, ECF No. 84).  Prior to December

13 13, 2005, LINA had not informed Plaintiff that the date November 30, 2005 held special

14 significance as the date LINA would require Plaintiff to prove disability.  When Plaintiff

15 submitted updated medical and functional evidence with his first appeal, LINA rejected

16 Plaintiff's medical evidence from "December 2005 to April 2006" because it was "several

17 weeks to several months after your Disability benefits ended and does not provide evidence

18 of continuous Disability as of November 30, 2005, when your benefits ended."  *Id*. at 1415.

19         With his second appeal, Plaintiff submitted a detailed statement from Dr. Tohidi, who

20 described LINA's basis for the rejecting Plaintiff's first appeal as "medically preposterous."

21 *Id*. at 891.  On October 23, 2006, Dr. Tohidi examined Plaintiff and reviewed the medical

22 records provided by Dr. Lin (dated December 20, 2005), Dr. Padilla (dated January 4, 2006)

23 and Dr. Helgager (dated February 9, 2006 and April 20, 2006), including X-rays taken on

24 January 4, 2006.  Dr. Tohidi concluded that each examining doctor "generally concur[s] with

25 my assessment of Mr. Nash and provide further evidence that Mr. Nash's illness has

26 progressed, as expected, in a degenerative way and shows no sign of improvement since Mr.

27 Nash's office visit with me in January 2005."  *Id*. at 890.  Dr. Tohidi stated:

28         Due to the progressive degenerative nature of Mr. Nash's illness, <u>the severity of
           hip illness has not and could not</u> have improved in the continuous period from

September 2003 to January 2006 and beyond. Additionally, the <u>resulting limitations and restrictions associated with his illness have not been and could not have been lifted</u> in the continuous period from September 2003 to January 2006 and beyond and certainly not on November 30, 2005 or on December 13, 2005.... I understand from reading the letter from [Defendant] dated July 10, 2006 to Mr. Nash that [Defendant] has apparently reasoned that since Mr. Nash was not seen during a specific period that he somehow was not disabled or limited and restricted at that time. This rationale is medically preposterous.

*Id*. at 884-85. Dr. Helgager concurred with Dr. Tohidi's reasoning in his June 26, 2007 Physical Abilities Assessment form, wherein he stated: "Due to the progressive nature of Mr. Nash's illness, these limitations/restrictions have not changed from the time that Mr. Nash was under the care of Dr. Tohidi to the time under which he came under my care." (PTO Ex. D at 39, ECF No. 58-1).

The Court of Appeals for the Ninth Circuit has echoed Dr. Tohidi's rationale in other cases. *See Silver v. Exec. Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 735 (9th Cir. 2006) ("We think it incredible that a man in Silver's physical condition, though completely disabled due to cardiac conditions in December and the following May, could have had his 'cardiac condition ... resolved within the [90-day] elimination period' [beginning December 14]."); *cf. Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1110 (9th Cir. 2003) ("A trier of fact ... could infer that functional limitations confirmed by treating physicians in June 1997, May 1998, and September 1998, more likely than not existed in March 1998 as well, rather than disappearing before March 1998 and reappearing thereafter."). In other cases, the Ninth Circuit has noted that when a plan administrator has been paying benefits, "in order to find [plaintiff] no longer disabled, one would expect the [medical evidence] to show an improvement, not a lack of degeneration." *Montour*, 588 F.3d at 635 ("Dr. Sukhov also fixated on the lack of progression (i.e., lack of further degeneration) in Montour's back condition, as evidenced by X-rays and MRIs taken in June 2004 and May 2006, and Hartford noted this in its decision on appeal. It is not clear why further degeneration is necessary to sustain a finding that Montour is disabled. Given that Hartford found Montour disabled in 2004 and paid him benefits for over two years, in order to find him no longer disabled, one would expect the MRIs to show an improvement, not a lack of degeneration.") (quotations omitted); *see also Saffon*, 522 F.3d at 871 (same).

In LINA's July 18, 2007 denial of Plaintiff's second appeal, LINA did not address Dr. Tohidi's October 26, 2006 opinion; instead LINA stated that Plaintiff's newly submitted "information ... did not add any further explanation of [Plaintiff]'s functionality as of November 30, 2005."  (PTO Ex. C at 2705, ECF No. 84).

The failure to address Dr. Tohidi's direct rejection of LINA's rationale is a factor the Court considers in determining whether LINA abused its discretion.  *Cf. Abatie*, 458 F.3d at 968 ("A court may weigh a conflict more heavily if, for example, the administrator ... fails to credit a claimant's reliable evidence....") (citation omitted).

### D.      Social Security Disability Determination

In *Montour*, the court stated:

> While ERISA plan administrators are not bound by the [Social Security Administration]'s determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was the product of a principled and deliberative reasoning process.  In fact, not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence....

> Ultimately, Hartford's failure to explain why it reached a different conclusion than the SSA is yet another factor to consider in reviewing the administrator's decision for abuse of discretion, particularly where, as here, a plan administrator operating with a conflict of interest requires a claimant to apply and then benefits financially from the SSA's disability finding.

588 F.3d at 635, 637 (quotation omitted).

The Plan required Plaintiff to apply for Social Security disability benefits which the Plan could and did deduct from his payments when granted.  Neither LINA nor its medical reviewers addressed the Social Security Administration's determination that Plaintiff was disabled.  This is a factor the Court considers in determining whether LINA abused its discretion.  *See id*.

### E.      Pain Medication

Neither LINA nor its medical reviewers articulated a rationale for rejecting Plaintiff's evidence that (1) narcotic pain medication was necessary for Plaintiff's pain symptoms, (2) the side effects of the medication included sedation and impaired cognitive abilities, and (3) Plaintiff was not able to perform the duties of his regular occupation with impaired cognitive abilities.  This is a factor the Court considers in determining whether LINA abused its

1  discretion.  *See Sacks v. Standard Ins. Co.*, 671 F. Supp. 2d 1148, 1165 (C.D. Cal. 2009) ("An

2  administrator abuses its discretion when it fails to consider how the side effects of a claimant's

3  medication impact the claimant's ability to perform her 'own occupation.'") (citing *Godfrey*

4  *v. BellSouth Telecomms., Inc.*, 89 F.3d 755, 759 (11th Cir. 1996); *Archuleta v. Reliance*

5  *Standard Life Ins. Co.*, 504 F. Supp. 2d 876, 886 (C.D. Cal. 2007); *Adams v. Prudential Ins.*

6  *Co. of Am.*, 280 F. Supp. 2d 731, 740 (N.D. Ohio 2003)).

7  **F.      Failure to Credit Plaintiff's Reliable Evidence**

8  In *Abatie*, the court stated that "[t]he level of skepticism with which a court views a

9  conflicted administrator's decision may be ... more heav[]y if, for example, the administrator

10  ... fails to credit a claimant's reliable evidence...."  *Abatie*, 458 F.3d at 968 (citing *Black &*

11  *Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)).  In *Nord*, the Supreme Court

12  stated: "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable

13  evidence, including the opinions of a treating physician."  538 U.S. at 834.

14  The Court finds that Plaintiff submitted reliable evidence of an impairment and resulting

15  functional limitations.  The Court concludes that Defendant arbitrarily and unreasonably

16  refused to credit this evidence.  In particular, Defendant disregarded–with minimal or no

17  explanation–the reports submitted by Plaintiff on administrative appeal of three examining

18  orthopedic specialists, Plaintiff's primary care physician and an examining physical therapist.

19  The Court views LINA's decision some skepticism due to LINA's conflict of interest.

20  **G.      Quality and Quantity of the Medical Evidence**

21  One of the "case-specific factors" that the Court considers in determining whether

22  LINA abused its discretion is "the quality and quantity of the medical evidence."  *Montour*,

23  588 F.3d at 630.  In viewing the medical evidence in the administrative record, the Court finds

24  that the quality and quantity of the medical evidence supports Plaintiff's claim that, during the

25  "regular occupation" period, Plaintiff was unable to perform the material duties of his regular

26  occupation due to severe osteoarthiritis of the left hip.

27

28  **H.      Summary**

The Court has reviewed and considered the entire administrative record.  Weighing all of the case-specific factors discussed above, the Court concludes that LINA abused its discretion in denying Plaintiff's claim for benefits.  In making its determination, the Court has viewed LINA's decision with skepticism due to LINA's conflict of interest.  However, even if the Court were to have conducted a "straightforward application of the abuse of discretion standard," *Montour*, 588 F.3d at 629, without consideration of the conflict of interest, the Court would nonetheless conclude that LINA abused its discretion in denying Plaintiff's claim for benefits.

## VI.    Remedy

Plaintiff requests that "[t]his Court ... reinstate [Plaintiff]'s claim, awarding the four (4) months outstanding own-occupation [long-term disability] benefits for December 2005 through March 28, 2005, plus the outstanding [long-term disability] benefits under the any occupation tier of the claim from 3/29/05 to date of judgment, and order that benefits are to continue for so long as Plaintiff remains disabled under the terms of the plan."  (ECF No. 85 at 58).

Plaintiff was denied on the basis of the "regular occupation" provision of the Plan, applicable for the first 30 months of Disability.  Awarding benefits up to the current date would involve a finding that Plaintiff also qualifies for benefits under the "any occupation" provision, applicable "[a]fter Disability has lasted 30 months."  (PTO Ex. C at 27, ECF No. 77-1).

Plaintiff contends that the Court should order retroactive reinstatement of benefits to the date of judgment because "no separate 'Claim' was required to be filed in order to continue receiving benefits under the Claim"; "LINA had already begun any occupation investigation, finding the relevant other occupations for which [Plaintiff] was educated trained or experienced would only pay a low fraction of his Indexed Predisability Earnings"; and Plaintiff's administrative remedies for "any occupation" benefits should be "deemed exhausted."  (ECF No. 85 at 58-59).  Plaintiff states:

> If the Court were to remand [Plaintiff]'s claim to LINA and only award a mere 4 months' benefits, so that LINA could again decide whether Plaintiff was eligible under the alternative 80% earnings requirement of the 'any occupation' definition tier—something it has already determined and found was not

> satisfied—it would afford LINA the impermissible 'second bite at the apple' this Circuit prohibits.

*Id*. at 59.  In support of this contention, Plaintiff relies upon *Pannebecker v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1213 (9th Cir. 2008) and *Grosz-Salomon v. Paul Revere Life Insurance Co.*, 237 F.3d 1154 (9th Cir. 2001).

> Defendant contends:

> As the Policy requires continuing proof of disability to obtain disability benefits and because LINA as the claim administrator has been granted the discretionary authority to determine eligibility for those benefits, any decision on whether Plaintiff qualifies for benefits under the 'any occupation' definition of disability must be remanded to LINA....  [T]here is no evidence before the Court that Plaintiff would have obtained disability benefits under the 'any occupation' definition.

(ECF No. 94 at 22).

> In *Pannebecker*, the court stated:

> The ERISA claimant whose initial application for benefits has been wrongfully denied is entitled to a different remedy than the claimant whose benefits have been terminated.  Where an administrator's initial denial of benefits is premised on a failure to apply plan provisions properly, we remand to the administrator to apply the terms correctly in the first instance.  But if an administrator terminates continuing benefits as a result of arbitrary and capricious conduct, the claimant should continue receiving benefits until the administrator properly applies the plan's provisions.

542 F.3d at 1221.

> In *Grosz-Salomon*, the court stated:

> [R]etroactive reinstatement of benefits is appropriate in ERISA cases where, as here, 'but for [the insurer's] arbitrary and capricious conduct, [the insured] would have continued to receive the benefits' or where 'there [was] no evidence in the record to support a termination or denial of benefits.'  In other words, a plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts.  This court's decision in *Saffle v. Sierra Pacific Power Company Bargaining Unit Long Term Disability Income Plan* does not counsel to the contrary.  *Saffle* stands for the proposition that 'remand for reevaluation of the merits of a claim is the correct course to follow when an ERISA plan administrator, with discretion to apply a plan, has misconstrued the Plan and applied a wrong standard to a benefits determination.'  This proposition is both unremarkable and inapposite.  First, as discussed above, the operative plan documents do not confer discretion on Paul Revere.  Second, even if they did, Paul Revere did not misconstrue the definition of 'disabled,' or apply the wrong standard to evaluate Grosz-Salomon's claim.  It applied the right standard, but came to the wrong conclusion.  Under these circumstances, remand is not justified.  Retroactive reinstatement of benefits was proper.

237 F.3d at 1163 (quoting *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 477 (7th

1    Cir. 1998); *Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income*

2    *Plan*, 85 F.3d 455, 461 (9th Cir. 1996)).

3          Because Defendant's decision to terminate Plaintiff's "regular occupation" benefits was

4    an abuse of discretion, the Court orders retroactive reinstatement of Plaintiff's "regular

5    occupation" benefits from the time they were terminated to the time that the "regular

6    occupation" benefits would have expired.   *See Pannebecker*, 542 F.3d at 1221;

7    *Grosz-Salomon*, 237 F.3d at 1163.

8          However, because Defendant has not decided Plaintiff's case under the "any

9    occupation" standard,[2] and the administrative record has not been adequately developed

10   regarding the "any occupation" standard, Plaintiff's request for "any occupation" benefits is

11   not an appropriate subject of this action.  *See Saffle*, 85 F.3d at 460 ("[Defendant] ... argues

12   that the district court erred by ordering benefit payments beyond the initial 24-month disability

13   period because Saffle never applied for general disability payments and her eligibility for the

14   second-tier benefits has never been considered by the Benefit Committee.  We agree that there

15   is nothing in the administrative record about general disability.  Of course it is the case, as

16   Saffle contends, that she could not have applied for general disability since she first must have

17   been awarded occupational disability benefits; but that affords no basis upon which to uphold

18   an order to pay benefits from the date of onset to the present.  Therefore, to the extent the

19   district court ordered payments beyond the initial 24-month disability period, it was error to

20   do so."); *Lavino v. Metro. Life Ins. Co.*, No. CV 08-2910, 2010 WL 234817, at *13 (C.D. Cal.,

21   Jan. 13, 2010) ("Because MetLife improperly terminated Plaintiff's benefits, reinstatement of

22   the terminated benefits is appropriate.  However, because MetLife has never had an

23   opportunity to decide Plaintiff's case under the 'any occupation' standard, Plaintiff's request

24   for 'any occupation' benefits is not an appropriate subject of this action.  This Court is not the

25   proper forum to submit an 'any occupation' claim in the first instance.  Remand is proper with

---

26

27          [2] On December 13, 2005, LINA's Misty Ferris wrote a "Second Eye Review," which
     stated that "there is nothing to support [total disability] his or any occ[upation] at this point."
28   (PTO Ex. C at 1873, ECF No. 82).  The Court does not find that this remark in the claim file
     is sufficient to support a finding that LINA decided that Plaintiff was not eligible for benefits
     under the "any occupation" standard.

respect to the any-occupation standard.") (citing *Saffle*, 85 F.3d at 461; *Pakovich v. Broadspire Servs., Inc.*, 535 F.3d 601, 605, 607 (7th Cir. 2008); *Scott v. Unum Life Ins. Co. of Am.*, No. C 05-275, 2006 WL 3533037, at *6 (N.D. Cal., Dec.7, 2006)); *Caplan v. CNA Fin. Corp.*, 544 F. Supp. 2d 984, 993 (N.D. Cal. 2008) (same); *cf. Pannebecker*, 542 F.3d at 1216 (administrator paid claimant full amount of "own occupation" benefits, and denied claim for benefits under "any occupation" standard); *Grosz-Salomon*, 237 F.3d at 1163 (case did not involve a change in the disability definition, and applied de novo review); *Austin v. Life Ins. Co. of N. Am.*, No. CV 08-8445, 2010 WL 1576718, at *15 (C.D. Cal., Apr. 13, 2010) ("Unlike the facts in *Lavino*, ... the evidence here shows that even though LINA terminated Plaintiff's benefits while she was still in the 24-month period for evaluation under the 'regular occupation' standard, its determination that Plaintiff was not totally disabled was made after evaluating the extent of Plaintiff's disability under both the 'regular occupation' and 'any occupation' standards."); *Roush v. Aetna*, No. CV-09-751, 2010 WL 2079766, at *17 (D. Ariz., May 24, 2010) (same).   The Court concludes that Plaintiff's request for "any occupation" benefits should be remanded for a determination by Defendant.

**<u>Conclusion</u>**

For the reasons stated above, the Court finds that Defendant abused its discretion by terminating Plaintiff's benefits under the "regular occupation" standard.

IT IS HEREBY ORDERED that Plaintiff's benefits under the "regular occupation" standard shall be reinstated from the time they were terminated to the time they were due to expire.  Given that Plaintiff qualified for a waiver of life insurance premiums while he was disabled under the Policy, and Defendant terminated Plaintiff's waiver of premiums when it terminated his disability benefits, the Court also awards Plaintiff past life insurance premiums paid from the date of termination to the time that  the "regular occupation" benefits were due to expire.

IT IS FURTHER ORDERED that Plaintiff's claim for benefits under the "any occupation" standard is remanded to Defendant for proceedings consistent with this Order.

The Clerk of the Court shall administratively close this case pending Defendant's

decision.  The case may be reopened at either party's request, at which time final judgment may be entered.

DATED:  December 9, 2010

**WILLIAM Q. HAYES**
United States District Judge